**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-2050**

SOUTHERN APPALACHIAN MOUNTAIN STEWARDS; SIERRA CLUB;
APPALACHIAN VOICES,

                Plaintiffs - Appellees,

      v.

A & G COAL CORPORATION,

                Defendant - Appellant.

------------------------------

VIRGINIA COAL AND ENERGY ALLIANCE, INCORPORATED; VIRGINIA
MINING ASSOCIATION; VIRGINIA MINING ISSUES GROUP; AMERICAN
FOREST AND PAPER ASSOCIATION; AMERICAN PETROLEUM INSTITUTE;
NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; NATIONAL
ASSOCIATION OF HOME BUILDERS; NATIONAL MINING ASSOCIATION;
UTILITY WATER ACT GROUP,

                Amici Supporting Appellant,

UNITED STATES OF AMERICA,

                Amicus Supporting Appellees.

Appeal from the United States District Court for the Western
District of Virginia, at Big Stone Gap.   James P. Jones,
District Judge. (2:12-cv-00009-JPJ-PMS)

Argued:  May 14, 2014           Decided:  July 11, 2014

Before WILKINSON, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Diaz joined.

---

**ARGUED**: Allen Wayne Dudley, Jr., JAMES C. JUSTICE COMPANIES, INC. & AFFILIATES, Roanoke Virginia, for Appellant. Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Appellees. **ON BRIEF**: Isak J. Howell, LAW OFFICE OF ISAK HOWELL, Lewisburg, West Virginia; Joseph M. Lovett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Appellees. George A. Somerville, Brooks M. Smith, TROUTMAN SANDERS LLP, Richmond, Virginia, for Amici Virginia Coal and Energy Alliance, Incorporated, Virginia Mining Association, and Virginia Mining Issues Group. James N. Christman, Richmond, Virginia, Karen C. Bennett, Kristy Bulleit, HUNTON & WILLIAMS LLP, Washington, D.C.; Jan A. Poling, Senior Vice President & General Counsel, AMERICAN FOREST & PAPER ASSOCIATION, Washington, D.C.; Nathan Gardner-Andrews, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, Washington, D.C.; Katie Sweeney, Amanda Aspatore, NATIONAL MINING ASSOCIATION, Washington, D.C.; Peter Tolsdorf, AMERICAN PETROLEUM INSTITUTE, Washington, D.C.; Tom Ward, NATIONAL ASSOCIATION OF HOME BUILDERS, Washington, D.C., for Amici American Forest and Paper Association, American Petroleum Institute, National Association of Clean Water Agencies, National Association of Home Builders, National Mining Association, and Utility Water Act Group.

---

WILKINSON, Circuit Judge:

The question in this case is whether the defendant-appellant, A & G Coal Corporation ("A&G"), can assert a "permit shield" defense for discharges of selenium when it failed to disclose the presence of this pollutant during the permit application process. We hold that the shield defense is unavailable to A&G.

I.

A&G owns and operates the Kelly Branch Surface Mine ("Kelly Branch") in Wise County, Virginia. In 2010, A&G applied for and received from the Virginia Department of Mines, Minerals, and Energy ("DMME") a National Pollutant Discharge Elimination System ("NPDES") permit for its discharges from Kelly Branch. In its permit application, A&G indicated that its operation at Kelly Branch was "bituminous coal mining." The application provided information regarding the discharges from more than two-dozen existing and proposed outfalls (discharge points of wastestreams into a body of water).

A&G included on the outfall list the two artificial ponds relevant to this case, each of which discharges into a tributary of Callahan Creek. The mining company identified the discharge from both ponds as "surface runoff" and indicated that one would also discharge "ground water." A source of the discharge for

3

both outfalls was identified as a "surface mine," while one of the ponds also identified "hollow fill underdrain" as an additional source. Nowhere, however, did the permit application state whether or not A&G would be discharging selenium, a naturally occurring element that can be harmful in high doses to aquatic life and is categorized as a toxic pollutant under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq. The permit that the DMME issued to A&G in 2010 neither authorizes nor restricts the discharge of selenium from Kelly Branch.

Plaintiff-appellees (environmental groups collectively referred to as Southern Appalachian Mountain Stewards, or "SAMS") sampled discharges from the two ponds, finding that they contained selenium. A&G's own subsequent sampling detected this element as well.[1] After complying with the applicable statutory notice requirements, SAMS brought this suit against A&G for declaratory and injunctive relief and civil penalties. SAMS contended that A&G was violating the CWA by discharging selenium from Kelly Branch without authorization to do so.

---

[1] The parties disagree about whether the selenium levels found in the samples violated Virginia water quality standards. Compare Appellant's Br. at 6 n.2, with Appellee's Br. at 6 n.2. We agree with the district court that we need not reach this question, because the issue before the court is whether A&G can utilize the permit shield, and not whether the selenium discharges were in excess of Virginia's regulations. See S. Appalachian Mountain Stewards v. A & G Coal Corp., No. 2:12CV00009, 2013 WL 3814340 at *2 n.3 (W.D. Va. July 22, 2013).

4

A&G responded that because it disclosed the pollutants that it knew or had reason to believe were present at Kelly Branch, selenium not among them, it complied with its legal obligations. In addition, it argued that the DMME reasonably contemplated that A&G could discharge the pollutant. Consequently, it was protected under the CWA's permit shield and did not violate the CWA. Both parties moved for summary judgment.

The district court denied A&G's motion and granted summary judgment to SAMS regarding the allegations under the CWA. It found that A&G's failure to disclose selenium in its permit application prevented it from receiving the protection of the CWA's permit shield. According to the district court, A&G's lack of knowledge that it was discharging selenium was irrelevant -- instead, the key consideration was whether the permitting agency contemplated the discharge. Finding no issues of material fact regarding A&G's lack of authorization to discharge selenium or whether the DMME contemplated the discharges, the court ruled in favor of SAMS. This appeal followed. We review the district court's grant of summary judgment de novo, requiring that the record contain no genuine issues of material fact and drawing all reasonable inferences on behalf of the non-moving party.

George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009).[2]

## II.

### A.

A brief description of the actual operation of the NPDES permitting process is necessary to an understanding of this case. The CWA was passed in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. It shifted the focus of federal water regulation from the condition of navigable waters to effluent limitations, prohibiting the discharge of pollutants into those waters, except where otherwise authorized by the Act. See id. § 1311(a). Relevantly, the CWA allows the federal government -- or by delegation, the states -- to issue NPDES permits for the discharge of certain pollutants. See id. § 1342(a), (b) (giving the Environmental Protection Agency ("EPA") authority to issue permits and allowing it to delegate administration of the permitting program to the states); United States v. Cooper, 482 F.3d 658, 661 (4th Cir. 2007) (noting that Virginia administers

---

[2] The district court order granted an injunction requiring the appellant to perform various remedial tasks related to its selenium discharges. Our jurisdiction to hear this appeal is predicated upon 33 U.S.C. § 1292(a)(1), which allows an appeal of such an order.

the state NPDES program). The DMME is the agency that issues and enforces NPDES permits for surface coal mines in Virginia. See Va. Code Ann. § 45.1-254.

Under the permitting scheme, a person wishing to discharge one or more pollutants applies for an individual permit from the proper state or federal agency. See 40 C.F.R. § 122.21. Using the disclosures from the application, as well as other available information, the agency then develops a draft permit made available to the public for notice and comment. After the administrative process has run its course, the agency can issue the permit. See 33 U.S.C. § 1342(a)(1), (b)(3); 40 C.F.R. §§ 122.41, 122.44, 124.10.

Federal regulations require that the permit application include significant detail regarding the nature and composition of the expected discharges. 40 C.F.R. § 122.21(g). There are two sets of pertinent requirements for applicants that operate within a primary industry category, including coal mining, depending on how their discharge is classified. Because there is a disagreement as to the nature of A&G's discharges, it is necessary to describe both regulations.

For those outfalls that discharge "process wastewater," defined as "any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product,

7

byproduct, or waste product," each applicant must report quantitative data on a large number of pollutants -- a list that includes selenium. Id. § 122.2 (defining "process wastewater"), 122.21(g)(7)(v)(B); part 122, Apps. A (listing coal mining as a primary industry category), D (listing selenium in table III as one of the pollutants that must be tested for in process wastewater pursuant to regulation). Thus, those discharging process wastewater must, as part of their permit applications, give a quantitative measure of selenium.

An applicant whose discharges are not classified as process wastewater must nonetheless "indicate whether it knows or has reason to believe that any of the pollutants in table II or table III of appendix D to this part [including selenium] . . . for which quantitative data are not otherwise required . . . [is] discharged from each outfall." Id. § 122.21(g)(7)(vi)(B). According to the instructions contained in the EPA's Application Form 2C, the form that must be filled out by any person applying to the agency to discharge wastewater of any sort, a party must mark whether each listed element, including selenium, is "Believed Present" or "Believed Absent." EPA, Application Form 2C – Wastewater Discharge Information (1990) ("Application Form 2C"). Thus, according to the EPA, "disclosure" means affirmatively informing the relevant agency of the presence or absence of specified pollutants.

8

Virginia has incorporated these same requirements into its own regulations, using nearly identical language. See 9 Va. Admin. Code § 25-31-100(H)(7)(e)(2) (requiring applicants in primary industry categories that discharge process wastewater to report quantitative data for those pollutants listed in table III of 40 C.F.R. part 122, appendix D, which includes selenium), 25-31-100(H)(7)(g) (requiring each applicant not discharging process wastewater to indicate whether it knows or has reason to believe that any pollutants listed in tables II or III of appendix D are being discharged). The state did not, however, stop there. The DMME's NPDES application instructions require that in addition to disclosing data regarding a series of parameters listed in the application's table, "information is required regarding the following pollutants; . . . Total Selenium . . . . The applicant must report at least one analys[i]s for each pollutant. Please attach certificate of analyses or reference appropriate information on file at the Division." J.A. at 356. The CWA sets the minimum requirements that states must demand in their NPDES applications, see 40 C.F.R. § 122.21(a)(2)(iv), but states can, as Virginia has done here, exceed that minimum and require more stringent reporting requirements.

The CWA contains a "permit shield" provision for those who have successfully applied for NPDES permits through the framework described above. It states that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance" with various sections of the statute that detail effluent limitations and their enforcement. 33 U.S.C. § 1342(k). The permit shield is meant to prevent permit holders from being forced to change their procedures due to changes in regulations, or to face enforcement actions over "whether their permits are sufficiently strict." E. I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 138 n.28 (1977). By rendering permits final, the shield allows permit holders to conduct their operations without concern that an unexpected discharge might lead to substantial liability.

But this broad protection comes with an important responsibility at the permit application stage: full compliance with federal and state reporting requirements, as well as with the conditions of the permit. We have previously noted just how crucial this provision of information is to the success of the CWA: "The effectiveness of the permitting process is heavily dependent on permit holder compliance with the CWA's monitoring and reporting requirements." Piney Run Pres. Ass'n v. Cnty. Comm'rs, 268 F.3d 255, 266 (4th Cir. 2001). Indeed, the extent

of the information provided has a direct impact on the applicability of the permit shield: "Because the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority during the permit application process" do not receive the shield's protection. Id. at 268.

This emphasis on disclosure echoes the reasoning of the EPA's Environmental Appeals Board ("EAB") in In re Ketchikan Pulp Co., 7 E.A.D. 605, 1998 WL 284964 (EAB 1998), to which we applied Chevron deference in Piney Run. See Piney Run, 268 F.3d at 266-68 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)). The EAB emphasized, as we did in Piney Run, the need for a party to properly document the contents of its discharges in order to avail itself of the permit shield. It noted that "the permit applicant's disclosures during the application process as to the wastestreams which may potentially be discharged, and the permit authority's knowledge as a result of that disclosure, are critical factors in determining whether the Shield defense i[s] applicable." Ketchikan, 1998 WL 284964 at *11. The administrative body continued:

11

> [W]hen the permittee has made adequate disclosures during the application process regarding the nature of its discharges, unlisted pollutants may be considered to be within the scope of an NPDES permit, even though the permit does not expressly mention those pollutants. The converse is also true: where the discharger has not adequately disclosed the nature of its discharges to permit authorities, and as a result thereof the permit authorities are unaware that unlisted pollutants are being discharged, the discharge of unlisted pollutants has been held to be outside the scope of the permit.

Id.

Relying on Ketchikan and its emphasis on the disclosure built into the CWA permitting scheme, we devised a two-part test in Piney Run to determine whether § 1342(k) shields a permit holder from liability:

> We therefore view the NPDES permit as shielding its holder from liability under the Clean Water Act as long as (1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was issued."

Piney Run, 268 F.3d at 259. A party must meet both prongs of this test in order to qualify for the shield. The key questions regarding A&G's discharges of selenium, then, are whether it provided adequate information to the DMME in order to comply with the law and permit conditions, and if the selenium discharges were within the reasonable contemplation of the DMME.

12

III.

A&G claims that it has met both prongs of the Piney Run test and as a result can assert the permit shield defense. It makes three distinct arguments to support this contention. We address them in turn.

A.

The heart of A&G's case is that it met prong one of the Piney Run test because, under the applicable regulations, it was required to identify selenium in its application only "if [it] knows or has reason to believe that [it] will be present in the discharges from any outfall." Appellant's Br. at 14 (internal quotation marks omitted). Because, A&G asserts, it had no such knowledge that selenium was present at Kelly Branch, it did not violate the CWA's disclosure requirements. See id. at 13-15.

We begin by noting that the provision on which A&G relies -- 40 C.F.R. § 122.21(g)(vi)(B) -- applies to those permit applicants who are not discharging "process wastewater." A&G's permit application states that both outfalls at issue would discharge "surface runoff" and "groundwater." See J.A. at 342. The United States has claimed, however, that the discharges described by A&G in its permit application actually meet the regulatory definition of process wastewater. See Br. of United States as Amicus Curiae at 22-24. If indeed A&G's discharge is process wastewater, then under 40 C.F.R. § 122.21(g)(7)(v)(B),

13

A&G would have been required to test for selenium and the other pollutants listed in table III of appendix D and submit those tests to the DMME as part of its permit application. We note the force of the government's definitional argument, but we need not decide the technical question of whether A&G mislabeled its discharges from the outfalls. For even assuming A&G properly identified its runoff, it still failed to fully "compl[y] with the express terms of the permit and with the Clean Water Act's disclosure requirements." <u>Piney Run</u>, 268 F.3d at 259.

The DMME's NPDES application instructions unequivocally require that an applicant submit an analysis of total selenium discharged as a part of the permit application. <u>See</u> J.A. at 356. It is uncontested that A&G did not submit any selenium data with its application. Furthermore, federal and Virginia regulations require that an applicant state whether it knows or has reason to believe any of the pollutants listed in tables II or III of 40 C.F.R. part 122, appendix D is discharged from each outfall. <u>See</u> 40 C.F.R. § 122.21(g)(7)(vi)(B), 9 Va. Admin. Code § 25-31-100(H)(7)(g). As noted, selenium is one of the pollutants listed in table III. As discussed above, EPA application instructions indicate that, consistent with the regulatory language, an applicant must affirmatively note on the application whether selenium is "Believed Present" or "Believed Absent." <u>See</u> Application Form 2C. Silence as to the existence of a referenced

14

pollutant is not adequate. Once again, it is uncontested that A&G did not indicate whether it believed selenium was present or absent anywhere in its application. As a result, we cannot find that the company met its disclosure obligations as required by prong one of the Piney Run test.

A&G's framing of the disclosure requirement -- that it needed to mention selenium only if it knew or had reason to believe that the element would be present in its discharges -- turns the presumptions of the CWA on their head. As noted above, the CWA and its implementing regulations focus on the information that the permit applicant must gather and provide to the permitting agency, so that it can make a fully informed decision to issue the requested permit. The statute and regulations purposefully place the burden of disclosure on the permit applicant. See Piney Run, 268 F.3d at 268 ("[W]here the discharger has not adequately disclosed the nature of its discharges to permit authorities, and as a result thereof the permit authorities are unaware that unlisted pollutants are being discharged, the discharge of unlisted pollutants has been held to be outside the scope of the permit.") (quoting Ketchikan, 1998 WL 284964 at *11).

Meanwhile, A&G's vision of disclosure, which asks solely about what the permit applicant knew about the presence of a pollutant when it applied for a permit, subtly absolves the

15

applicant of the need to provide the mandated information to the permitting authority. In order to do so, A&G replaces the requirement in 40 C.F.R. § 122.21(g)(7)(vi)(B) that an applicant "indicate whether" it knows or has reason to believe a pollutant is present with one that requires disclosure "if" the applicant has or should have knowledge. See Appellant's Br. at 14, Appellee's Br. at 30-31. A&G claims this difference is "immaterial," Appellant's Reply Br. at 6 n.7, but the alteration carries an important consequence. The need to "indicate whether" a pollutant is present requires that an applicant affirmatively disclose after appropriate inquiry its knowledge or lack of knowledge of that presence, as EPA Application Form 2C stipulates. This regulatory language is consistent with the CWA's emphasis on the need for full disclosure on the part of permit applicants. See Piney Run, 268 F.3d at 266, Ketchikan, 1998 WL 284964 at *11. By contrast, A&G's construction assigns to permit applicants a more passive role. It further encourages willful blindness by those discharging pollutants and prevents the state and federal agencies tasked by the CWA with protecting our waters from receiving the information necessary to effectively safeguard the environment.

In order to support its interpretation of our test, A&G attempts to shoehorn the facts of Piney Run into an argument in its favor. But the disclosures in that case make all the

16

difference. There, we stated, "a permit holder is in compliance with the CWA even if it discharges pollutants that are not listed in its permit, as long as it only discharges pollutants that have been adequately disclosed to the permitting authority." Piney Run, 268 F.3d at 268. We went on to find that during the permitting process, the applicant, unlike A&G, did disclose to the agency that it would be discharging heat (the pollutant) as a part of its operations. Id. at 271-72. A&G similarly tries to rely on Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co., 12 F.3d 353 (2d Cir. 1993) to defend its lack of disclosure, but this effort is also unavailing. As the EAB noted in Ketchikan, "Eastman Kodak therefore stands for the proposition that the discharge of unlisted pollutants is permissible when the pollutants have been disclosed to permit authorities during the permitting process." 1998 WL 284964 at *10 (emphasis added). Because A&G did not disclose selenium during the permitting process, these cases are of no assistance.

A&G and its amici claim that in order to find that the coal company was required to disclose selenium, we must expose all permit applicants to the prospect of endless disclosure of countless known pollutants. See Appellant's Br. at 14, Br. of Amici Curiae Am. Forest & Paper Ass'n et al. at 13-15, Br. of Amici Curiae Va. Coal & Energy Alliance, Inc. et al. at 12-14. But this slippery-slope concern does not comport with the CWA

17

scheme. Selenium is not just some obscure pollutant that might happen to show up in a discharger's wastestream. It is one of fifteen "Other Toxic Pollutants (Metals and Cyanide) and Total Phenols" listed in table III of appendix D to part 122 of 40 C.F.R. Table II lists an additional 110 pollutants. Under the relevant federal and state regulations, an applicant must disclose "whether it knows or has reason to believe that any of the pollutants listed" in these two tables are being discharged. 40 C.F.R. § 122.21(g)(7)(vi)(B); see also 9 Va. Admin. Code § 25-31-100(H)(7)(g). We do not pretend that it places no burden on an applicant to disclose its knowledge, or lack thereof, of the presence of the listed pollutants in its discharges. But it did not strike the framers of the CWA and its regulations as too high a price to pay for the significant protections of the permit shield.

B.

A&G next argues that its disclosures were adequate because under a 1995 EPA policy memorandum, the permit shield applies to those "[p]ollutants not identified as present but which are constituents of wastestreams, operations or processes that were clearly identified in writing during the permit application process and contained in the administrative record which is available to the public." EPA, Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES

18

Permits ("1995 EPA Policy Statement") at 3 (Apr. 11, 1995) (emphasis omitted). Because, A&G contends, it clearly identified its wastestreams, operations, and processes in the permit application, and selenium was a constituent of its wastestreams, it acted consistently with EPA's guidance on disclosures. See Appellant's Br. at 18-19.

We do not find, however, that the memorandum provides A&G with the support it seeks. First and foremost, the same document states very clearly that "[t]he availability of the section 402(k) permit shield is predicated upon the issuance of an NPDES permit and a permittee's full compliance with all applicable application requirements, any additional informational requests made by the permit authority and any applicable notification requirements." 1995 EPA Policy Statement at 2. As discussed above, A&G has not complied with the application instructions or the notification requirements in the state and federal regulations. It cannot simply use this assertedly favorable language to circumvent its failure to disclose as required.

A&G's interpretation of the 1995 EPA Policy Statement is also at odds with the EPA's own interpretation of the CWA in Ketchikan. In that adjudication, a permit-holding pulp mill attempted to access the permit shield defense for discharges of flocculent and cooking acid. In its permit application, it disclosed that it would discharge "Water Treatment Plant

19

Filtration Backwash" from one of its outfalls, and that it engaged in "Pulp Bleaching & Formation" that would contribute wastewater to another. It did not, however, identify the presence of flocculent or cooking acid. Ketchikan, 1998 WL 284964 at *4, *18. The permit issued to the pulp mill accordingly made no mention of either substance. Id. at *5.

Like A&G, the pulp mill argued that the NPDES regulations are designed to provide flexibility to a permit holder, and that a general disclosure of wastestreams, operations, and processes was sufficient to gain access to the permit shield. Id. at *14. But the EAB, in evaluating an EPA policy memorandum nearly identical to that put forward here by A&G, found that this general description of the plant's operation did not provide the agency with adequate information about the mill's discharges to qualify the applicant for the permit shield.

In particular, the EAB rejected an argument that the discharge of cooking acid was "implicitly" covered by the permit, because the agency was generally aware that spills occur and did not specifically proscribe the discharge of the pollutant. Id. at *16. This argument strongly resembles that of A&G, and the EAB emphatically rejected it: "[T]here is nothing in that 'general' description indicating that cooking acid would be discharged under any circumstances. In short, there is nothing in the application which could have or should have put

20

Region permitting authorities on notice that [the mill] would discharge cooking acid (magnesium bisulfite)." Id. at *18. Thus, the EPA's construction of its own guidance, endorsed by this court in Piney Run, forecloses A&G's argument that its general disclosure was sufficient.

## C.

Finally, A&G argues there is a genuine issue of material fact concerning whether the DMME anticipated that the coal company would discharge selenium. Thus for purposes of summary judgment, it contends, it can also meet the second prong of the Piney Run test: that its discharges of selenium were within the reasonable contemplation of the DMME. See Appellant's Br. at 19-22.[3]

Because we have found that A&G fails the first prong of the Piney Run test, we need not reach its contention that it has

---

[3] A&G has also argued that the district court abused its discretion by refusing to consider the untimely submission of a 1997 letter regarding selenium testing in the area of Kelly Branch. We find no abuse of discretion in the district court's decision to evaluate the submission pursuant to Federal Rule of Civil Procedure 6(b), nor in its application of the excusable neglect test. See S. Appalachian Mountain Stewards v. A & G Coal Corp., No. 2:12CV00009, 2013 WL 3814340 at *3-*4 & n.4 (W.D. Va. July 22, 2013). The determination of whether to admit evidence -- here made after deploying the fact-dependent, four-factor excusable neglect test -- is precisely the type of decision that the district court is best positioned to make. We decline to substitute the judgment of an appellate court for that of the district judge who oversaw the taking of evidence throughout the summary judgment process.

21

also met the second prong. We nonetheless highlight the lack of consistency that plagues A&G's argument. A&G has asserted repeatedly that it had no reason to believe that it would discharge selenium from Kelly Branch. In the same breath, however, it contends that, because it had previously informed the DMME of the presence of selenium at a different mine in the same watershed, the Kelly Branch selenium discharges were within the reasonable contemplation of the agency.

This is difficult to comprehend. Either A&G and the DMME should both have been aware that selenium would be discharged, or neither had reason to be. If the former is true, then A&G fails prong one of the Piney Run test because it did not indicate that it had reason to believe that it would discharge selenium. If the latter is correct, and neither the permit applicant nor the agency reasonably anticipated the discharge, then A&G fails both prongs of Piney Run. Not only, as discussed above, did the coal company not comply with the reporting requirements of its permit instructions and the relevant regulations; it also would have provided no evidence that the DMME had reason to anticipate the selenium discharges. Appellant's attempt to have it both ways underscores why it cannot prevail.

IV.

A&G requests that we remand this case for further factual development. We find no need to do so. There is no question that A&G was discharging selenium from Kelly Branch. There is no question that selenium is a pollutant under the CWA. And there is no question that A&G was required by its DMME permit application instructions to test for the presence of selenium and by federal and state regulations to, at minimum, report whether it believed selenium to be present or absent. It failed to fulfill these obligations.

All that is before us is the question of whether the defendant can assert the 33 U.S.C. § 1342(k) permit shield as an affirmative defense. As with any such defense, the defendant bears the burden of proving that it may validly advance it. See Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012). To allow the defense in these circumstances would tear a large hole in the CWA, whose purpose it is to protect the waters of Appalachia and the nation and their healthfulness, wildlife, and natural beauty. See id. § 1251(a) (stating that the goal of the CWA is to safeguard the chemical, physical, and biological integrity of American waters).

We thus affirm the judgment.

AFFIRMED

23