**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 13-2014**

───────────

DANA T. WEST, individually and on behalf of all others similarly situated; ANTHONY HAIG; GARY SAUNDERS; MICHAEL WASHINGTON,

     Plaintiffs - Appellants,

  and

ERIC JONES; KEVIN ADAMS; TONIA BOWIE; DAVID COLYNS; AARON ROSS,

     Plaintiffs,

    v.

SUSAN MURPHY, former Warden, Baltimore Central Booking and Intake Center, individually and in her official capacity; WILLIAM JEDNORSKI, former Warden, Baltimore Central Booking and Intake Center, individually and in his official capacity,

     Defendants - Appellees,

  and

CITY OF BALTIMORE; BALTIMORE CITY POLICE DEPARTMENT; MAYOR AND CITY COUNCIL OF BALTIMORE; MITCHELL FRANKS, Warden, Baltimore Central Booking and Intake Center, individually and in his official capacity,

     Defendants.

───────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:05-cv-01287-CCB)

───────────

Argued: September 17, 2014          Decided: November 14, 2014

_____

Before WILKINSON, SHEDD, and WYNN, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Wynn joined. Judge Wynn wrote a separate concurring opinion.

_____

**ARGUED:** Barrett Stephen Litt, KAYE MCLANE BEDNARSKI & LITT, Pasadena, California, for Appellants. William F. Brockman, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Sean R. Day, Greenbelt, Maryland; William Claiborne, Washington, D.C., for Appellants. Douglas F. Gansler, Attorney General, Matthew J. Fader, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

_____

2

WILKINSON, Circuit Judge:

This 42 U.S.C. § 1983 action involves strip searches of arrestees in the Baltimore Central Booking and Intake Center. The district court granted defendants' motions for summary judgment on the grounds of qualified immunity. Jones v. Murphy, 2013 WL 822372, at *6 (D. Md. Mar. 5, 2013). We now affirm.

I.

A.

The named plaintiffs are men who went through the booking process at the Baltimore Central Booking and Intake Center in Baltimore, Maryland ("Central Booking"). They represent a certified class of persons who were arrested between May 12, 2002, and April 30, 2008, "(a) on charges [or in cases] not involving weapons, drugs, or felony violence, and (b) strip searched (c) prior to or without presentment before a court commissioner or other judicial officer." Jones v. Murphy, 2013 WL 822372, at *3 (D. Md. Mar. 5, 2013). The district court defined a strip search as "the removal, pulling down, or rearrangement of clothing for the visual inspection of a person's genital and/or anal areas, which may also include requiring the person to squat and cough, in the presence of one or more guards." Id. The defendants are two former wardens of Central Booking.

Central Booking opened in 1995. The facility has two sections: the booking area and the housing unit. Only activities on the booking floor are at issue in this case.

After an individual is arrested in Baltimore, a transport officer brings him or her to Central Booking. Each arrestee enters the facility through a gender-specific sallyport, where an officer searches the arrestee with a metal detector and a pat-down. The sallyport officer puts a color-coded wristband on the arrestee. Scanning the barcode on the wristband allows an officer to view the arrestee's name, the charge, which officer arrested him, as well as the date, time, and location of the arrest. Some arrestees already have wristbands when they arrive; others come only with a "toe tag," which is a form listing the information that will be connected to the barcode. The sallyport officer also conducts a brief medical examination of the arrestee.

Following that, arrestees proceed to a search room where officers conduct a more thorough search, bagging and inventorying any personal property. Plaintiffs allege that at this stage of the process correctional officers conducted strip searches of the type described by the class certification order. In order to conduct the search, officers remove arrestees' handcuffs or flex-cuffs, which generally remain off for the remainder of the booking procedure. From the search room, an

4

officer guides the arrestee to an intake window, where an intake officer inputs toe-tag information into the computer system and asks medical questions. An officer then escorts the arrestee to another room to be fingerprinted and photographed. Eventually, the arrestee is either brought before a commissioner or released without charge.

Between the various stages of the booking process, arrestees may be held in holding rooms with other arrestees. They remain in holding rooms while they wait to see a court commissioner, which under Maryland law must occur within 24 hours of the arrest. Md. Rule 4-212(f). Officers do not separate arrestees by crime of arrest or criminal history. In fact, officers often know only what is on the toe-tag, and even the name given on the toe-tag (and in the computer system) may be an alias. It is not until after the fingerprinting stage that officers have access to the arrestee's criminal history and any outstanding warrants. The holding rooms may contain up to 25 arrestees at a time, but over the course of his stay in Central Booking an arrestee may share a room with many more than 25 others because of the ingress and egress of people in any given holding room. The four named plaintiffs shared rooms with 55, 36, 35, and 20 different persons, respectively, who had been arrested for a variety of crimes, including firearm violations,

drug crimes, assault, burglary, automobile theft, and armed robbery.

All told, Central Booking processed an average of 229 arrestees per day during the class period. Each arrestee inevitably interacted with many other arrestees during his stay, including those charged with both minor and serious offenses. Roughly three-quarters of class members were not committed to the housing unit, but in total only 51% of all arrestees were released either before or after seeing a court commissioner. Therefore, plaintiffs had "substantial contact with other detainees, including some who were later admitted to general population" of the housing unit. Jones, 2013 WL 822372, at *5.

As the district court noted, contraband poses significant security risks and dangers inside detention facilities. Weapons or other items may be used to attack officers or other arrestees. Id. at *2. Arrestees may overdose on drugs, or their intoxication may create additional burdens for officers. Id. Arrestees arriving at Central Booking have been found to have firearms, razor blades, knives, drugs, cigarettes, cell phones, and other items on their persons. Id.; J.A. at 193, 328, 335, 340-43, 567-68, 601-03, 611, 715-16, 1007-08, 1077-78, 1232-35, 1244-45, 1381-82, 1478-79, 1502-04, 1717, 1750-52. The more thorough searches in the search room have turned up drugs, cigarettes, lighters, money, cell phones, razor blades, and

6

knives. Jones, 2013 WL 822372, at *2; J.A. at 193, 335, 340-43, 601-03, 1077, 1478-79, 1502-04, 1750-52. Even so, contraband has made its way into the holding rooms. According to the testimony of correctional officers, one arrestee was wounded by box cutters, and another attempted to commit suicide with a razor blade. Jones, 2013 WL 822372, at *2; J.A. at 716, 1007. Plaintiffs acknowledge arrestees used drugs while in holding rooms. Jones, 2013 WL 822372, at *2; J.A. at 1342, 1812-13.

B.

This litigation has been ongoing since arrestees filed their initial complaint in 2005. The Fourth Amended Complaint consisted of twelve counts and sought certification of five separate class actions. This appeal concerns only Count 1, which the district court certified under Federal Rule of Civil Procedure 54(b). In 2007, the district court initially denied defendants' motions to dismiss, holding that the wardens were not entitled to qualified immunity because "the right of those arrested for offenses not likely to involve weapons or contraband to be free from strip searches without any individualized finding of reasonable suspicion appears to be clearly established" in the Fourth Circuit. Jones v. Murphy, 470 F. Supp. 2d 537, 547 (D. Md. 2007) (citing Amaechi v. West, 237 F.3d 356, 365 (4th Cir. 2001); Abshire v. Walls, 830 F.2d 1277, 1279-80 (4th Cir. 1987); Logan v. Shealy, 660 F.2d 1007, 1013

7

(4th Cir. 1981)). However, the court reversed course in its 2013 summary judgment opinion, highlighting "the present lack of a clear test applicable to the specific circumstances of detention practices at [Central Booking] during the years at issue in this litigation." Jones, 2013 WL 822372, at *6. This more recent decision is the subject of this appeal.

The Supreme Court's intervening decision in Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), prompted the district court to change direction. The Supreme Court held that "every detainee who will be admitted to the general population [of a jail] may be required to undergo a close visual inspection while undressed." Id. at 1513. The district court determined that Florence "overruled some aspects of Fourth Circuit law" on which the 2007 decision had "relied," and "left the contours of any 'exception' that would apply to the plaintiffs in this case unclear and open to debate." Jones, 2013 WL 822372, at *6.

II.

A.

Plaintiffs claim that the district court erred in holding that the wardens were entitled to qualified immunity. Under the doctrine of qualified immunity, a government official is not personally liable for damages resulting from his actions if his "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Determining whether qualified immunity applies involves a two-prong inquiry: "whether the facts . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009).

The law is clearly established if "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." Al-Kidd, 131 S. Ct. at 2083. The universe of existing precedent is not unlimited. Courts "'ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'" Lefemine v. Wideman, 672 F.3d 292, 298 (4th Cir. 2012) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (1999)), vacated on other grounds, 133 S. Ct. 9 (2012).

Qualified immunity takes cognizance of human imperfections. "Implicit in the idea that officials have some immunity . . . for their acts, is a recognition that they may

9

err" and "that it is better to risk some error and possible injury from such error than not to decide or act at all." Scheuer v. Rhodes, 416 U.S. 232, 242 (1974), abrogated by Harlow, 457 U.S. 800. Qualified immunity thus "shield[s] officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. "[I]nsubstantial lawsuits" create "social costs," among them the unwarranted inhibition of basic public functions. Harlow, 457 U.S. at 814. Such suits also discourage "capable citizens [from] join[ing] the ranks of public servants" and threaten to undermine "officers' discretion and expertise." Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011). Courts thus do not penalize officials for "'bad guesses in gray areas.'" Id. (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

We review the grant of summary judgment de novo, S. Appalachian Mountain Stewards v. A & G Coal Corp., 758 F.3d 560, 562 (4th Cir. 2014), "tak[ing] care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions," Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014). We may address either prong of the qualified immunity analysis first. Pearson, 555 U.S. at 236. Here the availability of the qualified immunity defense makes it unnecessary to take up the merits of plaintiffs' constitutional challenge.

10

B.

Defendants contend, and the district court held, Jones v. Murphy, 2013 WL 822372, at *6 (D. Md. Mar. 5, 2013), that Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), demonstrates that the law was not clearly established even though that decision came several years after the close of the class period.

The relevant question, however, is whether the law was clearly established as of the time of the search. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (examining the state of the law "at the time of [the] arrest"); al-Kidd, 131 S. Ct. at 2083 (determining whether the law was clearly established "at the time of the challenged conduct"); Wilson v. Layne, 526 U.S. 603, 614 (1999) ("[W]e now must decide whether this right was clearly established at the time of the search."); Anderson, 483 U.S. at 640 ("[I]n the light of pre-existing law the unlawfulness must be apparent."); Mitchell v. Forsyth, 472 U.S. 511, 535 (1985) ("The decisive fact is . . . that the question was open at the time he acted.").

This temporal element inheres in qualified immunity because the inquiry into "clearly established law" is tethered to the need for notice. Public officials, no less than private citizens, are entitled to know when their actions violate the law. Notice means prior notice, not notice after the fact.

11

Reichle, 132 S. Ct. at 2093 (The clearly established law requirement allows officers to "anticipate when their conduct may give rise to liability for damages." (quoting Anderson, 483 U.S. at 639)); Hope v. Pelzer, 536 U.S. 730, 739 (2002) (The requirement "'ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful.'" (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)); Braun, 652 F.3d at 561 ("Proper notice to public officials lies at the heart of qualified immunity.").

Decisions issued after the allegedly unconstitutional conduct do not affect whether the law was clearly established at the time of the conduct unless, of course, the later decision addresses or otherwise illuminates whether the law was clearly established at the time of the challenged official action. In some instances, the law may change for the apparent benefit of government officials. But though such a change in law may indicate that there was no constitutional violation on the merits, it does not affect whether the law was clearly established because the favorable judicial decision could not have informed the officials' understanding of whether their actions were unlawful. Of course the need for prior notice is a two-way street. It is just as likely that a later-in-time judicial decision could clearly establish the illegality of the conduct in question. But later-in-time is not at the time, and

12

prescience is not to be presumed in granting or withholding the immunity.

The Supreme Court decided Florence on April 2, 2012. See 132 S. Ct. at 1510. The class period in this case ran from May 12, 2002, until April 30, 2008. Jones, 2013 WL 822372, at *3. As Florence came down almost four years after the class period closed, it does not demonstrate that the law on jail strip searches either was or was not clearly established at the time these alleged searches were conducted.

III.

Plaintiffs rely on Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981), and cite Amaechi v. West, 237 F.3d 356 (4th Cir. 2001), and Abshire v. Walls, 830 F.2d 1277 (4th Cir. 1987), to assert that during the class period it was clearly established that strip searches of the type performed in Central Booking were unconstitutional. Logan, Amaechi, and Abshire, however, do not clearly establish that the wardens' alleged conduct was unlawful.

In Logan, this court utilized the balancing test of Bell v. Wolfish, 441 U.S. 520 (1979), to find that a jail strip search was unreasonable and thus a violation of the Fourth Amendment. 660 F.2d at 1013. Bell instructs courts to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in

13

which it is conducted." 441 U.S. at 559. Logan had been arrested for driving while intoxicated and brought before a magistrate, who issued an arrest warrant and ordered her released on her own recognizance after a period of four hours (so she could sober up) or as soon as someone could pick her up. 660 F.2d at 1009-10. A sheriff's deputy, however, refused to let her call a friend until she had been strip-searched. Id. at 1010. That search took place in a holding room with a window with the blinds raised, such that her naked body was "exposed to the general view of persons known to be in the vicinity." Id. at 1014.

The court held that the search was unconstitutional, reasoning:

> On the undisputed and stipulated evidence, Logan's strip search bore no such discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified. At no time would Logan or similar detainees be intermingled with the general jail population; her offense, though not a minor traffic offense, was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; there was no cause in her specific case to believe that she might possess either; and when strip-searched, she had been at the Detention Center for one and one-half hours without even a pat-down search.

Id. at 1013. The court emphasized the lack of privacy in the location where the search was performed. Id. at 1014.

14

_Logan_ is a far cry from this case. Unlike in _Logan_, Central Booking officers conduct the thorough searches in a dedicated search room, not a holding room with a transparent window. Moreover, defendants here have pointed to, and the district court has recognized, _Jones v. Murphy_, 2013 WL 822372, at *2 (D. Md. Mar. 5, 2013), significant security justifications for the searches allegedly conducted. Preventing the smuggling of drugs, weapons, and other contraband into a detention facility is a legitimate justification, especially where arrestees such as the plaintiffs mingle with dozens of other arrestees for up to 24 hours. There was no comparable security justification -- indeed no credible justification at all -- advanced in Logan's case. She was set to leave the jail shortly, and presumably without interacting with other arrestees. In analyzing qualified immunity we are required to define the right in question "at a high level of particularity," _Edwards v. City of Goldsboro_, 178 F.3d 231, 251 (1999), and be mindful of the "specific context of the case," _Saucier v. Katz_, 533 U.S. 194, 201 (2001). In the context of Central Booking, it was not "sufficiently clear that every reasonable official would have understood that what he is doing" failed the _Bell_ test and contravened _Logan_. _Ashcroft v. al-kidd_, 131 S. Ct. 2074, 2083 (2011) (citation, quotation marks, and alterations omitted).

15

For similar reasons, neither Amaechi nor Abshire clearly established that the Central Booking searches were unconstitutional. In Amaechi, police officers arrested a woman for a noise violation that occurred two days prior. 237 F.3d at 359. She was wearing only a light dress that was missing buttons so it could not close below the chest unless she held it shut. Id. at 359 n.7. The police refused to let her change; when they handcuffed her, she was left essentially naked. Id. at 359. An officer then proceeded to physically search her in front of her home; he "squeezed her hips, and inside her opened dress, 'swiped' one ungloved hand, palm up, across her bare vagina, at which time the tip of his finger slightly penetrated Amaechi's genitals," and then "knead[ed]" her buttocks with his hand. Id. There is no comparison between Central Booking and the physically and sexually abusive search of Amaechi, which "took place directly in front of the Amaechis' townhouse, where the other police officers, Amaechi's husband, her five children, and all of her neighbors had the opportunity to observe." Id. at 360.

In Abshire, the strip search of the male arrestee was performed in a utility room with the door open so that more than a half dozen police officers, including one woman, viewed it. 830 F.2d at 1279-80. The officers had not even done a pat-down of Abshire; the strip search appeared to have been conducted in

16

retaliation for Abshire's repeated request to make a phone call. Id. The weak justifications for the search did not outweigh the manner in which the officers conducted the search. Id. at 1280. And the contact with large numbers of variously charged arrestees that is present in this case was nowhere mentioned in Abshire.

We do not require that a prior case be identical to the case at bar for fair notice to be provided. See Hope v. Pelzer, 536 U.S. 730, 741 (2002). But "'in the light of pre-existing law the unlawfulness must be apparent.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Under the Bell balancing test, the searches in Logan, Amaechi, and Abshire were unconstitutional because there were no security reasons strong enough to justify the intrusive and public nature of the searches. The searches allegedly performed at Central Booking, however, were conducted in a different and less public setting than those described by our precedents, and the security justifications for the Central Booking searches were more compelling. We do not address the constitutional merits of these searches. But "[g]iven such an undeveloped state of the law," the immunity defense does not permit us to tax correctional officers with clairvoyance. Wilson v. Layne, 526 U.S. 603, 617 (1999).

17

IV.

The district court ultimately was correct that the defendants are entitled to qualified immunity because the law did not clearly establish at the time that the searches were conducted that they were unlawful.

AFFIRMED

WYNN, Circuit Judge, concurring:

I concur in the well-reasoned majority opinion. I write separately to underscore the importance of addressing the legality of strip searching detainees held outside the general population in the appropriate case.

In Florence v. Board of Chosen Freeholders of County of Burlington, the Supreme Court left open the question of whether strip searching detainees held outside the general population would be constitutional. 132 S. Ct. 1510, 1511 (2012) ("[T]he controversy concerns whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed.") (emphasis added). The splintered Florence decision included two concurrences and a strongly worded dissent, each of which expressed unease with the indiscriminate strip searching of detainees held outside of the general population. See id., 132 S.Ct. at 1523 (Roberts, C.J., concurring); id. at 1524 (Alito, J., concurring); id. at 1525 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting).

Thus, in Florence, the Supreme Court staked out an important limitation to its holding. Florence does not apply to strip searches of detainees held outside of the general population. It now falls to us to apply the Constitution and relevant precedent to those cases that Florence does not

19

control.  Clearly, as this Court holds today, our ruling in Logan v. Shealy does not put officers on reasonable notice as to the limits the Constitution places on strip searches under the circumstances of this case.  660 F.2d 1007, 1013 (4th Cir. 1981).

This Circuit has held that it is appropriate to address the constitutional merits in a qualified immunity case where doing so would "clarify and elaborate upon our prior jurisprudence in important and necessary ways."  See Doe ex rel. Johnson v. S. Carolina Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).  There can be no question that our jurisprudence in this area needs clarification and elaboration.

Unfortunately, by not reaching the constitutional merits in this matter, we leave corrections officers adrift in uncharted waters.  Nonetheless, because the trial court confined itself to the "clearly established" prong of the qualified immunity analysis and did not reach the constitutional merits, and because the parties focused on the "clearly established" prong on appeal, I join with the majority opinion in delaying our

consideration of this important constitutional issue for another day.[*]

---

[*] In fact, pending before this same panel is <u>Cantley v. West Virginia Regional Jail</u>, No. 13-7655, in which the district court held that the strip search of a detainee held outside the general jail population was constitutional.

21