**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1700**

GEORGE WINGATE,

Plaintiff - Appellant,

v.

SCOTT FULFORD; DIMAS PINZON,

Defendants - Appellees,

and

S. A. FULFORD,

Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:18-cv-00937-AJT-IDD)

Argued: December 8, 2020                Decided: February 4, 2021
                    Amended: February 5, 2021

Before GREGORY, Chief Judge, NIEMEYER, and RICHARDSON, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded with instructions by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Richardson joined. Judge Richardson wrote a concurring opinion.

**ARGUED:** Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. Alexander Francuzenko, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellees. **ON BRIEF:** Bernadette E. Valdellon, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. Michael D. Arena, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellees.

GREGORY, Chief Judge:

George Wingate III was driving down Jefferson Davis highway around 2 a.m. one morning when his check engine light came on. Mr. Wingate pulled his car over near a streetlight to look under the hood. A Stafford County deputy patrolling the area, Deputy Scott Fulford, saw Mr. Wingate's vehicle. Suspecting the car was disabled, Deputy Fulford pulled behind Wingate, hoping to help. But the officer's roadside assistance quickly transformed into an investigatory stop, then an arrest, after Mr. Wingate declined to comply with Deputy Fulford's request for identification.

This appeal arises out of Mr. Wingate's civil suit, under 42 U.S.C. § 1983 and Virginia common law, challenging his stop, arrest, and subsequent prosecution. The district court denied Mr. Wingate's motion for summary judgment and granted summary judgment to Deputy Fulford and Lt. Pinzon ("the Officers") on each of Mr. Wingate's claims. On appeal, we affirm in part, reverse in part, and remand for a trial on damages.

I.

The parties do not dispute the material facts of this case.

In the early morning hours of April 25, 2017, Mr. Wingate was driving southbound on Jefferson Davis Highway in Stafford County, Virginia. At some point between 1 and 2 a.m., Wingate's check-engine light came on. He pulled his car off to the side of the road and parked it in front of the CarStar car dealership, under an illuminated streetlight. Mr. Wingate left his lights on, popped the hood, and began to investigate. As a former mechanic, he believed that he might be able to resolve the problem. Mr. Wingate circled around to the

3

trunk of his car where he pulled out a bag of tools. He placed the bag on the front passenger seat, then began to look under the hood. Finding nothing, Mr. Wingate reentered his car and tried to diagnose the issue using an automotive code reader that connected to his phone via Bluetooth. The reader later indicated that one of his engine's cylinders was misfiring.

Around this time, Deputy Fulford was driving northbound on the highway. The deputy saw Mr. Wingate's vehicle off to the side of the road. Deputy Fulford was concerned that the car was "disabled," so he turned around, pulled behind Mr. Wingate, and began to get out of the car. Upon seeing the patrol vehicle, Mr. Wingate got out of his car and walked over to greet the officer. Deputy Fulford asked Mr. Wingate what was going on and where he was going. Mr. Wingate explained that he was driving to his girlfriend's house in Stafford but had experienced some car trouble along the way.

Deputy Fulford then requested Wingate's identification. After Mr. Wingate asked why he had to disclose his identity, Deputy Wingate activated his mic and requested backup. The two men then engaged in the following exchange:

Fulford:   Well, in Stafford County —
Wingate:  Have I committed a crime?
Fulford:   — it's required.
Wingate:  Have I committed a crime?
Fulford:   No. I didn't say you did.
Wingate:  All right then.
Fulford:   You're still required to —
Wingate:  Am I free to go?
Fulford:   — identify yourself.
Wingate:  Am I free to go?
Fulford:   Not right now, no.
Wingate:  Am I being detained?

<pre>
Fulford:    You're not detained.
Wingate:    Am I free to go?
Fulford:    No.
Wingate:    Am I being detained?  If I'm not being detained, then I'm free to go.
Fulford:    You're not free to go until you identify yourself to me.
</pre>

Dash Cam Video at 1:40:08–31.

Lt. Pinzon arrived at the scene shortly thereafter.  Lt. Pinzon informed Mr. Wingate that there had been "a lot of catalytic converter thefts in [the] area," and noted, "It's kind of weird, it's 2 o'clock in the morning, and you're out here on the side of the road in the same area where the businesses have all been hit."  *Id.* at 1:43:32–45.  Mr. Wingate responded, "Well, I haven't committed any crimes."  *Id.* at 1:43:45–49.  Undeterred, the Officers again asked for Mr. Wingate's ID.  *Id.* at 1:43:50–52, 1:44:11–13.  Mr. Wingate again asked why he needed to identify himself.  *Id.* at 1:44:13–1:45:05.  Eventually, the Officers attempt to arrest him, citing Stafford County Ordinance § 17–7(c).  *Id.* at 1:45:04–1:47:20.  Section 17–7(c) makes it a crime to refuse an officer's request for identification "if the surrounding circumstances are such as to indicate to a reasonable man that the public safety requires such identification."  J.A. 322.

Mr. Wingate resisted the Officers' attempts to place him in handcuffs.  Eventually, he broke free from the Officers' hold and began to flee, running across the street and out of the dash camera's frame.  *Id.* 1:47:18.  Mr. Wingate stopped when Lt. Pinzon drew his Taser and pointed it in his direction.  Lt. Pinzon then grabbed Mr. Wingate by the shirt, ordered him to the ground, and "threw him to the ground with one arm when [Mr. Wingate] didn't comply."  J.A. 291.  After a brief struggle, Lt. Pinzon and Deputy Fulford put Mr. Wingate in handcuffs and placed him in the back of the patrol car.  The Officers searched

5

Mr. Wingate's car incident to arrest. The search revealed a bag of tools, a pair of gloves, and a title certificate. Mr. Wingate did not, however, have ramps or a Sawzall—tools commonly used to steal catalytic converter belts. J.A. 114, 138.

Mr. Wingate was criminally charged for failing to identify himself; intentionally preventing a law enforcement officer from lawfully arresting him; knowingly attempting to intimidate or impede a law-enforcement official; and possessing an open certificate of title.[1] But on the date set for trial, the prosecuting attorney assigned to the case dropped all of the charges. The attorney informed Deputy Fulford that defense counsel "had brought up some case law that made [§ 17–7(c)] appear possibly unconstitutional." J.A. 62. Deputy Fulford's understanding was that they dropped the charges because "they didn't want to risk losing [the ordinance]." J.A. 63.

Mr. Wingate filed this suit in July 2018, asserting claims against Deputy Fulford under 42 U.S.C. § 1983 and the Virginia common law. Mr. Wingate then amended his complaint to join Lt. Pinzon as a defendant. Following discovery, the parties filed cross-motions for summary judgment. The district court granted the Officers' motion and denied Mr. Wingate's. Mr. Wingate timely appealed.

II.

We review a district court's grant of summary judgment de novo, using the same standard applied by the district court. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)

---

[1] The open certificate of title was for a different car that Mr. Wingate had purchased two weeks before but not yet titled in his own name. J.A. 128.

(*en banc*).  Summary judgment is only appropriate if "no material facts are disputed and the moving party is entitled to judgment as a matter of law."  *Id.* (internal quotation marks omitted).  Ordinarily, when a district court's grant of summary judgment disposes of cross-motions for summary judgment, "we consider each motion separately on its own merits," resolving "all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Id.*  Here, however, the parties do not present competing versions of the facts but competing views of the law.  Thus, we review the propriety of the district court's rulings on both motions in tandem.

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. CONST. amend. IV.  These protections extend to "brief investigatory stops . . . that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  For investigatory stops, "the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause."  *Id.*  To that end, law enforcement need only reasonable, articulable, and particularized suspicion that someone is engaged in criminal activity to justify these brief interactions.  *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997).

That this standard requires less than probable cause does not render its burden illusory.  "[A]n officer who stops and detains a person for investigative questioning 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  *Id.*  (quoting *Terry v. Ohio,* 392 U.S. 1, 21 (1968)).  We have often emphasized that the Fourth Amendment

7

requires particularity—"a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity." *See*, *e.g.*, *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011) (emphasis in original); *see also United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015); *United States v. Griffin*, 589 F.3d 148, 154 (4th Cir. 2009). Although the need for reasonable and particularized suspicion is "somewhat abstract," *Arvizu*, 534 U.S. at 274, it unquestionably requires more than "an inchoate and unparticularized suspicion or hunch." *Slocumb*, 804 F.3d at 682.

To be sure, Deputy Fulford did not trigger the Fourth Amendment's protections by merely driving up to Mr. Wingate to provide roadside assistance. Officers may approach someone absent suspicion of criminal conduct and "generally ask questions of that individual," *Florida v. Bostick*, 501 U.S. 429, 435 (1991), request cooperation in a criminal investigation, *United States v. Weaver*, 282 F.3d 302, 311–12 (4th Cir. 2002), or provide assistance, *United States v. Monsivais*, 848 F.3d 353, 356, 358 (5th Cir. 2017). And they routinely do.

But Deputy Fulford then told Mr. Wingate that he was not free to leave until he identified himself. This unambiguous restraint on Mr. Wingate's liberty converted the previously voluntary encounter into a compelled detention—an investigatory stop. *See Santos v. Frederick Cnty Bd. of Com'rs*, 725 F.3d 451, 462 (4th Cir. 2013) (voluntary encounter became an investigatory stop when woman submitted to officer's unambiguous direction remain seated); *Bostick*, 501 U.S. at 434 (explaining that an encounter will "trigger Fourth Amendment scrutiny" when "it loses its consensual nature"); *see also* Dash Cam Video at 1:40:18–20.

8

Deputy Fulford argued before the district court that the stop was constitutional because, at that point, he reasonably suspected that Mr. Wingate was engaged in criminal activity—specifically, larceny. The court agreed, identifying six factors that, in its view, would give an objectively reasonable officer constitutionally adequate suspicion: (1) Mr. Wingate's vehicle was parked with its hood up near the CarStar lot at roughly 1:39 a.m.; (2) the vehicle was in the "dimly lit parking lot of a closed and empty business late at night . . . despite better lit areas just down the road"; (3) the vehicle was near parked CarStar cars "during a period of increased vehicular larcenies and in an area known for prevalent vehicular crimes"; (4) Mr. Wingate exited his vehicle without prompting as Deputy Fulford exited his cruiser; (5) Mr. Wingate was wearing all-black clothing "similar to the suspects identified and apprehended during the recent increase in late-night vehicular larcenies"; and (6) Mr. Wingate said he was having engine trouble even though the car appeared to be properly idling.

We evaluate these considerations both separately and in the aggregate, recognizing that "factors 'susceptible to innocent explanation' individually may 'suffice[] to form a particularized and objective basis' when taken together." *Slocumb*, 804 F.3d at 682 (quoting *Arvizu*, 534 U.S. at 277) (modification in original). Ultimately, we conclude that the innocuous circumstances of this encounter fall short of indicating that criminal activity was afoot.

First, Mr. Wingate's vehicle was parked with its hood up near the CarStar lot at roughly 1:39 a.m. Alone, this fact does little to suggest criminal activity. In fact—and as Fulford initially reasoned—it indicates a very specific, non-criminal enterprise: attempting to identify and remedy car problems.

9

Second, Mr. Wingate's vehicle was in the "dimly lit parking lot of a closed and empty business late at night . . . despite better lit areas just down the road."[2] J.A. 45. We have previously held that "there is nothing inherently suspicious about driving at night on an interstate highway." *Williams*, 808 F.3d at 248. The natural corollary of this proposition should go without saying: there is nothing inherently suspicious about engaging in conduct attendant to nighttime highway travel—for example, experiencing car troubles. Within this context, the fact that Wingate parked his car at a closed business or in a "dimly lit area" are mere proxies for the fact that it was, indeed, late at night.

Third, Mr. Wingate parked near CarStar cars "during a period of increased vehicular larcenies and in an area known for prevalent vehicular crimes." J.A. 45. This factor, too, is insufficiently particular. Courts may consider whether a person is in a "high crime area," but simply being in an area where crime is prevalent is minimally probative in the reasonable suspicion analysis. *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020) ("A person's presence in a high-crime area cannot alone create reasonable suspicion to justify a *Terry* stop."); *Black*, 707 F.3d at 542 (denouncing the suggestion that "mere presence in a high crime area at night is sufficient justification for detention by law enforcement"); *Williams*, 808 F.3d at 248 (affording "very little weight" to the fact that individuals were driving down a highway known as "drug corridor"). This is all the more true when the "high-crime area" identified comprises an entire county. *See* J.A. 79 ("The

---

[2] Deputy Fulford's suggestion that Mr. Wingate knew or should have known there was a better-lit area up the road is unsupported by the record. We do not expect prescience from officers when evaluating their conduct. Nor do we expect it from lay people with even less reason to be aware of their surroundings.

10

county had been getting hit pretty hard with vehicle larcenies throughout that month, and I believe also in the previous month."); J.A. 241 ("Deputy Fulford was aware that there had been increased vehicle larcenies throughout Stafford County."). CarStar itself had only had 8 larcenies over the course of six years. J.A. 287. Within the larger grid—the 820-foot area surrounding CarStar—there were 18 larcenies over the course of six years. *Id.*

Fourth, Mr. Wingate exited his vehicle without prompting as Fulford exited his cruiser. At Fulford's deposition, he testified that this was a "red flag" for him. J.A. 72. From his experience, "when somebody exits their vehicle and begins to walk away from their vehicle, it's because they are [] trying to get the attention off of the vehicle if there's something in plain view that [an officer] might see." J.A. 75. Deputy Fulford went on to say, "[G]enerally if somebody's broken down on the side of the road, they stay inside their vehicle. And when they get out, a lot of times that causes alarm." J.A. 78. To be sure, if a person gets out of her vehicle without prompting following a for-cause traffic stop, there may be cause for concern. But the notion that the driver of a broken-down vehicle creates suspicion of criminal activity by approaching the officer trying to render him aid, put candidly, defies reason. Although we generally defer to officers' claimed training and experience, we withhold that deference when failing to do so would erode necessary safeguards against "arbitrary and boundless" police prejudgments. *Black*, 707 F.3d at 541. That is the case here.

Fifth, Mr. Wingate was wearing all-black clothing "similar to the suspects identified and apprehended during the recent increase in late-night vehicular larcenies." Dark attire might be necessary to successfully engage in larceny. But it is far from sufficient. Indeed,

11

wearing dark clothing is often as innocuous as following the latest fashion trends. This is not to say that distinctive items of clothing may never substantially aid in the reasonable suspicion analysis. But when a nondescript style of clothing is commonplace for both criminal suspects and an immeasurable subset of the law-abiding population, it is of little investigatory value.

Finally, Mr. Wingate said he was having engine trouble even though the car appeared to be properly idling. As any seasoned driver knows, a vehicle that runs is not always a vehicle that runs well. It is therefore unreasonable for an officer to assume deceit from a person claiming car trouble simply because the vehicle appears functional at a glance. The record indicates that the only reason that Deputy Fulford found the properly idling car suspicious was because of his own mistaken prejudgment that it was "disabled." J.A. 80. Mr. Wingate never told Fulford that his car was disabled. J.A. 212. Lt. Pinzon testified that, when he approached, "there was nothing obvious to say it was a disabled vehicle." J.A. 321(b). And neither Deputy Fulford nor Lt. Pinzon testified that, based on their training and experience, people experiencing engine trouble do not pull off the road unless their cars are completely disabled. Deputy Fulford's assessment of Wingate's credibility was untethered to any objective criteria. It therefore had little value in suggesting that criminal activity was afoot. *Black*, 707 F.3d at 540 (declining to give weight to an officer's "irrational" observation).

These factors do not fare better when viewed together. We need look no further than Deputy Fulford's own words to conclude that the first three factors—even when viewed as a whole—indicated a car in distress, not criminal activity. In the dash cam video,

12

Deputy Fulford explained why he pulled over behind Mr. Wingate: "I drive by and I see somebody with the hood up. So, guess what I'm going to do as a police officer? . . . I'm going to pull over and I'm going to try to help that person." Dash Cam Video at 1:42:41–49. Then, again, during his deposition, Deputy Fulford explained, "For Mr. Wingate with his hood up initially, like I said[,] when I pulled in I thought he was, you know, I thought he was disabled." J.A. 80. The question then becomes whether Deputy Fulford's remaining concerns—that Mr. Wingate exited his properly idling vehicle in all-black clothing—can carry the weight that the district court afforded them. The answer? They can't.

The insufficiency of Deputy Fulford's suspicion is apparent when we compare it to the type of suspicion found adequate in other cases. *C.f. Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (officer had particularized suspicion of criminal activity when person in area of heavy narcotics trafficking engaged in unprovoked flight upon seeing police); *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (officers had reasonable and particularized suspicion that someone was trespassing when seen loitering in a high-crime area of a shopping center, without shopping bags, in front of a sign that said "no trespassing"); *United States v. Hernandez-Mendez*, 626 F.3d 203, 206, 209–10 (officer's surveillance, professional training, and extensive personal experience with a particular high school's gang activity created reasonable suspicion of criminal activity). One of the more striking points of comparison is our decision in *Perkins*, where we held that an officer's stop was supported by reasonable suspicion when, before stopping a red car outside 2740 Knox Avenue, the officer knew:

13

(1) Knox Avenue was a high-crime, drug-ridden neighborhood in which children were commonly present; (2) he had taken part in four or five drug investigations on Knox Avenue; (3) the duplex at 2740 Knox Avenue was a known drug house under investigation by the police's drug unit; (4) Officer Burdette had personally arrested the residents of one of the units in that duplex on several occasions; (5) an unnamed caller had reported observing two white males pointing rifles in various directions in the front yard of that duplex; (6) these men reportedly arrived in a red car with a silver or white stripe; (7) Mrs. Hayes, a resident who lived directly across the street from the duplex, normally reported this type of conduct to the police; (8) Mrs. Hayes had given reliable information about illegal activity in this area at least six to ten times before; (9) shortly after the phone call to the police, there were indeed two white males in a red car bearing a silver or white stripe, parked next to another car right outside the duplex at 2740 Knox Avenue; (10) the passenger in the car was Mark Freeman, a well-known drug purchaser who lived in the neighborhood; and (11) the red car pulled away when the officers arrived.

*United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).

Deputy Fulford, by contrast, first began to suspect criminal activity when a man that he intended to help approached him in dark clothing. That is not enough. As Mr. Wingate argues, the level of objective, reasonable, and particularized suspicion in this case is more akin to that which we found lacking in cases like *Slocumb*, 804 F.3d at 682–84, *Black*, 707 F.3d at 531, 539–42, *Williams*, 808 F.3d at 247–53, and *Massenburg*, 654 F.3d at 489–91. The district court therefore erred in finding Fulford's stop was supported by reasonable and particularized suspicion.[3]

---

[3] Mr. Wingate also argues that the unreasonable scope and duration of his detention made the seizure unconstitutional, even if it was justified at its inception. Because we hold that the encounter became unconstitutional as soon as Deputy Fulford told Mr. Wingate that he was not free to leave, we need not address Mr. Wingate's alternative argument.

14

B.

Mr. Wingate's arrest was likewise unlawful. "[E]very arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Michigan v. Summers*, 452 U.S. 692, 700 (1981). J.A. 322. Deputy Fulford and Lt. Pinzon argue that they had probable cause to arrest Mr. Wingate after he failed to identify himself. But, guided by *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 187–88 (2004) and *Brown v. Texas*, 443 U.S. 47, 52 (1979), we hold that this ordinance is unconstitutional when applied outside the context of a valid investigatory stop.

Stafford County Ordinance § 17–7(c) makes it a crime "for any person at a public place or place open to the public to refuse to identify himself . . . at the request of a uniformed law-enforcement officer . . . if the surrounding circumstances are such as to indicate to a reasonable man that the public safety requires such identification." J.A. 322. The Supreme Court's seminal cases on "stop and identify" statutes such as § 17–7(c) are *Hiibel*, 542 U.S. at 187–88 and *Brown*, 443 U.S. at 49–52. *Brown* involved a Texas law that made it a criminal offense for someone to "intentionally refuse[] to report . . . his name and residence address" to an officer "who ha[d] lawfully stopped him and requested the information." *Id.* at 49 n.1. Invoking this statute, the officers stopped Brown and asked that he identify himself. *Id.* at 49–50. Although Brown was walking in a "high crime" area and "looked suspicious," the officers did not "suspect [him] of any specific misconduct." *Id.* at 50. Upon failing to identify himself, Brown was arrested, charged, and ultimately convicted under the Texas statute—a conviction the Supreme Court reversed. *Id.* at 49–50, 52–53. *Brown* recognized that the Texas statute was "designed to

15

advance a weighty social objective in large metropolitan centers: prevention of crime." *Id.* at 52. Still, it held that a worthy objective did not "negate Fourth Amendment guarantees." *Id.* ("[E]ven assuming that [crime prevention] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.")

*Hiibel* then answered the question that *Brown* left open: whether a state may compel someone to disclose her name during an otherwise valid *Terry* stop. 542 U.S. at 185–86; *see also Brown*, 443 U.S. at 53 n.3. The Supreme Court upheld the use of stop and identify statutes within this context "because it properly balance[d] the intrusion on the individual's interests with the promotion of legitimate government interests." *Id.* at 186–88. *Hiibel* also found that, in many respects, the individual and government interests implicated by stop and identify statutes were coextensive with those implicated by *Terry* itself. *Id.* at 188. On the government-interest side of the ledger, "[t]he request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop" and "[t]he threat of criminal sanction helps ensure that the request for identity does not become a legal nullity." *Id.* Moreover, the request rarely imposes additional burdens on individuals' interests in being free from government intrusion. An identity request ordinarily "does not alter the nature of the stop itself: it does not change [the stop's] duration, [] or its location []." *Id.* (citing *United States v. Place*, 462 U.S. 696, 709 (1983); *Dunaway v. New York*, 442 U.S. 200, 212 (1979)).

16

Because identity requests implicate the same interests as *Terry* stops, they are also subject to the same constitutional limits. When pressed on the risk of arbitrary policing, *Hiibel* explained that the safeguards inherent in *Terry* likewise constrained an officer's authority to compel disclosure of someone's identity. *Id.* at 189 (quoting *Terry*, 392 U.S. at 20) ("Petitioner's concerns are met by the requirement that a *Terry* stop must be justified at its inception and 'reasonably related in scope to the circumstances which justified the initial stop.'"). For example, "an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop." *Id.* Nor may the request impermissibly extend the stop, suggesting "an effort to obtain an arrest for failure to identify after a *Terry* stop yielded insufficient evidence." *Id.*

Read together, *Brown* and *Hiibel* illustrate that a valid investigatory stop, supported by *Terry*-level suspicion, is a constitutional prerequisite to enforcing stop and identify statutes.[4] Necessarily so. The prevailing seizure jurisprudence flows from the idea that, short of an investigatory stop, a person is "free to disregard the police and go about his business." *Cf. California v. Hodari D.*, 499 U.S. 621, 628 (1991); *Brendlin v. California*, 551 U.S. 249, 254–55 (2007); *I.N.S. v. Delgado*, 466 U.S. 210, 216–17 (1984). To be sure, officers may always request someone's identification during a voluntary encounter. *Bostick*, 501 U.S. at 434–35; *Delgado*, 466 U.S. at 216–17. But they may not compel it by

---

[4] This holding establishes a constitutional floor for enforcing stop and identify statutes. Notably, an ordinance may impose additional statutory prerequisites to enforcement. Here, for example, § 17–7(c) also requires that a public safety interest justify the compelled disclosure of someone's identity.

threat of criminal sanction. Allowing a county to criminalize a person's silence outside the confines of a valid seizure would press our conception of voluntary encounters beyond its logical limits. We therefore decline to do so here.

As discussed, Deputy Fulford's initial stop was not justified at its inception. The Officers do not argue, nor does the record suggest, that they acquired constitutionally adequate suspicion of criminal activity between the deputy's initial stop and the Officers' eventual arrest.[5] Accordingly, the Officers enforced Stafford County's stop and identify statute outside the context of a valid *Terry* stop, and arrested Mr. Wingate on that basis. The arrest was therefore unconstitutional. The district court erred in holding otherwise.

## C.

The question remains whether Deputy Fulford and Lt. Pinzon are entitled to qualified immunity for their violations of Mr. Wingate's Fourth Amendment rights. Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). The doctrine shields government officials from

---

[5] The Officers do not argue that Mr. Wingate's failure to disclose his identity, in itself, created reasonable suspicion of criminal activity sufficient to justify a stop. Properly so. Implied in our holding that stop and identify statutes are only constitutionally enforceable during a valid *Terry* stop is the assumption that the stop is predicated on suspicion of criminal activity *distinct from* a person's failure to disclose her identity. *See Hiibel*, 542 U.S. at 188–89 (cautioning against using an identity request to *create* suspicion of criminal activity). In other words, an officer cannot initiate an investigatory stop based on suspicion that someone would refuse an identity request during a valid investigatory stop.

18

liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The burden of establishing a qualified immunity defense rests on the official asserting the defense. *Meyers v. Baltimore County*, 713 F.3d 723, 731 (4th 2013). The officer must show either that she did not violate a constitutional right or that the right was not clearly established at the time her conduct occurred. *Id.*

Deputy Fulford is not entitled to qualified immunity for his unconstitutional investigatory stop. As Mr. Wingate argues, the circumstances here are nearly indistinguishable from those in *Slocumb*, 804 F.3d at 682–84—a case where we found officers lacked the requisite suspicion to conduct an investigatory stop. The officers in *Slocumb* saw a man, woman, and two infant children near two cars in a parking lot known for illegal drug transactions. *Id.* at 679–80. The two adults were transferring a child's car seat from one car to another. *Id.* at 680. One of the officers approached the group and "noticed that the man appeared to be hurrying the woman." *Id.* When asked, the man told the officer that his girlfriend's car had broken down and that he had come to pick her up. *Id.* During this seconds-long conversation, the officer concluded the man was "acting evasively" because he "did not make eye contact and gave mumbled responses to officer's questions," and conducted an investigatory stop. *Id.* We found the officer lacked reasonable suspicion, explaining that the government failed to explain how Slocumb's innocent acts "were likely to be indicative of some more sinister activity," *id.* at 684, and cautioning the government that it "must do more than simply label a behavior as suspicious to make it so." *Id.* (internal quotation marks omitted). *Slocumb* put Deputy Fulford on

19

notice that the circumstances present here were too innocuous to give rise to reasonable suspicion.

This conclusion is only bolstered by pre-*Slocumb* cases like *Black* and *Massenburg*. In *Black*, 707 F.3d 541–42, we explained that a person's presence "in a high crime area at night" is of little investigatory value and warned officers against making "irrational assumptions based on innocent facts." *Id.* at 542. We also highlighted four of our previous decisions, where "we admonished against the Government's misuse of innocent facts as indicia of suspicious activity." *Id.* at 539 (quoting *United States v. Powell*, 666 F.3d 180 (4th Cir. 2011); *Massenburg*, 654 F.3d at 480; *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011); and *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011)). One of those cases was *Massenburg*. There, we held that an officer lacked reasonable suspicion to stop and frisk an individual who (1) was found in the vicinity of several gunshots, (2) responded nervously when approached by the police, and (3) was reluctant to consent to a pat down. *Massenburg*, 654 F.3d at 489. We said in no uncertain terms: "[The government] cannot simply proffer whatever facts are present, no matter how innocent, as indicia of suspicious activity." *Id.* (internal quotation marks omitted).

Deputy Fulford's suspicion of criminal activity in this case is on par with that which we found insufficient in *Slocumb*, and pales in comparison to that which we found lacking in *Massenburg*. Because these cases placed Deputy Fulford on notice that suspicion of criminal activity must arise from conduct that is more suggestive of criminal involvement than Mr. Wingate's was, he is not entitled to qualified immunity for his unlawful investigatory stop.

20

The Officers are, however, entitled to qualified immunity for their unlawful arrest under Stafford County Ordinance § 17–7(c). Until today, no federal court has prescribed the constitutional limits of § 17–7(c)'s application. And although the proper reading of *Brown* encompasses Stafford County's ordinance, it was not "plainly incompetent" for the Officers to believe that § 17–7(c) fell outside the decision's reach. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The law at issue in *Brown* criminalized a person's refusal to identify himself to an "officer who ha[d] lawfully stopped him." *Brown*, 443 U.S. at 49 n.1. Because the Texas provision only applied in the context of lawful investigatory stops, the need to comply with *Terry*'s requirements was evident from the text of the statute. Stafford County's ordinance, on the other hand, does not predicate enforcement upon the investigation of criminal activity. Rather, it criminalizes a person's refusal to provide his identity upon an officer's request "if the surrounding circumstances are such as to indicate to a reasonable man that the *public safety* requires such identification." J.A. 322 (emphasis added). A reasonable officer could infer—albeit incorrectly—that *Terry*'s requirements did not apply to stop and identify statutes rooted in public safety rather than crime prevention.

Deputy Fulford and Lt. Pinzon violated Mr. Wingate's Fourth Amendment rights by enforcing § 17–7(c) outside the context of a valid *Terry* stop. But because this right was not clearly established at the time of the arrest, the Officers are entitled to qualified immunity on this claim.

21

III.

Finally, we review the district court's grant of summary judgment on Mr. Wingate's claims under the Virginia common law: false arrest and malicious prosecution. The district court found that these claims were derivative of Wingate's unlawful arrest claim—each required a showing that the Officers lacked probable cause to arrest Mr. Wingate and charge him with a crime. J.A. 48–49. Since the district court held Deputy Fulford and Lt. Pinzon's arrest was supported by probable cause, it granted the Officers summary judgment on the pendant common law claims as well. *Id.* We affirm the district court's grant of summary judgment on these claims. But because the court's ruling is rooted in an incorrect probable-cause determination, we affirm on separate grounds.

Under Virginia law, false imprisonment is defined as "the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (2011). That said, Virginia law provides a defense to officers who subjectively "believed[] in good faith, that [their] conduct was lawful" and whose subjective beliefs were objectively reasonable. *DeChene v. Smallwood*, 311 S.E.2d 749, 751 (1984) (quoting *Bivens v. Six Unknown Named Agents of Fed. Bur. Of Narc.*, 456 F.2d 1339, 1347 (2d Cir. 1972)). Although there is limited guidance on the scope of this defense, *DeChene*'s reliance on *Bivens* suggests that Virginia's good-faith exception is congruent with the federal qualified immunity defense. *See id.* We therefore hold that, because the Officers are entitled to qualified immunity on Mr. Wingate's unlawful arrest claim under federal law, they are also entitled to the good faith defense to Mr. Wingate's false arrest claim under Virginia law.

22

The Officers are also entitled to summary judgment on Mr. Wingate's malicious prosecution claim. To prove a malicious prosecution claim under Virginia common law, Mr. Wingate must establish that a defendant (1) instituted or procured a criminal prosecution of the plaintiff; (2) without probable cause; (3) acted maliciously; and (4) the prosecution was terminated in a manner not unfavorable to the plaintiff. *Brice v. Nkaru*, 220 F.3d 233, 237 (4th Cir. 2000). Malice exists when the individual who institutes or procures the prosecution has a "*controlling* motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (1998). "Malice is not presumed by law; it must exist in fact and be proven like any other fact." *Montanile v. Botticelli*, No. 1:08-cv-0716(JCC), 2008 WL 5101775, at *4 (E.D. Va. Nov. 25, 2008) (citing *Freezer v. Miller*, 176 S.E. 159, 168 (1934)). The record before the district court is devoid of any evidence of malice as defined by Virginia law. And, on appeal, Mr. Wingate fails to argue to the contrary. The Officers are therefore entitled to judgment on this claim.

Albeit on separate grounds, we affirm the district court's grant of summary judgment for the Officers on Mr. Wingate's claims under the Virginia common law.

IV.

In sum, the district court erred in granting Deputy Fulford summary judgment on Mr. Wingate's claim that the deputy conducted an unconstitutional investigatory stop. We reverse and remand for further proceedings consistent with this opinion. We affirm the

23

district court's grant of summary judgment for the Officers on Mr. Wingate's remaining federal and common law claims.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS*

RICHARDSON, Circuit Judge, concurring:

I readily concur with the majority's resolution of this case. But I have one reservation. The majority holds that constitutionally enforcing Stafford County Ordinance § 17-7(c) requires "a valid investigatory stop, supported by *Terry*-level suspicion." Majority Op. 17. And in the circumstances this case presents, I agree that enforcing the ordinance required *Terry*-level suspicion. But I would be clear that we address only this case and not the constitutionality of applying an ordinance like this one outside the context of investigatory stops.

Consider, for example, an officer requiring a driver's identification at a constitutionally proper, but suspicionless, sobriety checkpoint. Or an officer at a border crossing or secure facility who asks for identification from someone seeking entry. In those instances (and others), the encounter *might* constitutionally permit enforcing a law requiring identification. Those circumstances were not addressed in *Brown v. Texas*, 443 U.S. 47 (1979) or *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177 (2004). And I would make plain that we are not expanding their guidance here, where we are without briefing on those issues and those circumstances are not before us.