PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HEATHER BRAUN; JOSEPH L.
GOODRICH; GEORGE KEEFER; KRISTI
MORROW; ROBERT MUMMA; JOSEPH
L. RODRIGUEZ; JEREMY SOWERS;
AMBER WARD,

        *Plaintiffs-Appellants,*

        v.

GARY D. MAYNARD; MICHAEL J.
STOUFFER; D. KENNETH HORNING;
JAMES V. PEGUESE; FREDERICK
WALLS; KENNETH FRICK; TONYA
LEONARD; RHONDA RALSTON; JOHN
DOE, in their individual capacities
as employees of the Maryland
Department of Public Safety and
Correctional Services,

        *Defendants-Appellees.*

No. 10-1401

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:09-cv-01897-JFM)

Argued: May 10, 2011

Decided: July 21, 2011

Before WILKINSON and SHEDD, Circuit Judges, and
David C. NORTON, Chief United States District Judge for
the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Norton joined.

---

**COUNSEL**

**ARGUED:** Robert David Schulte, SCHULTE BOOTH, PC, Baltimore, Maryland, for Appellants. Michael O'Connor Doyle, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Neil Hyman, LAW OFFICE OF NEIL S. HYMAN, LLC, Bethesda, Maryland, for Appellants. Douglas F. Gansler, Attorney General of Maryland, Lisa O. Arnquist, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

On August 12, 2008, officials at the Maryland Correctional Training Center conducted a drug interdiction operation using a portable ion scanning machine capable of detecting minute amounts of controlled substances. Upon entering the building, several employees and independent contractors of the Maryland Department of Public Safety and Correctional Services alerted for the presence of drugs and were then searched. Nothing turned up. The aggrieved employees filed suit, alleging principally that the searches violated their Fourth Amendment rights. The district court held that the defendants were entitled to qualified immunity and dismissed the suit.

We affirm. The prison officials in this case faced difficult questions lying at the intersection of the Fourth Amendment's broad commands, the prison's compelling needs, and technol-

ogy's innovations. Although it was clearly established that intrusive prison employee searches require reasonable suspicion, it was far from clear that the devices at issue here could not meet that standard. Because no clearly established federal law placed the officers on notice that fighting contraband in the prison environment in this manner was unlawful, we agree with the district court that the immunity attached.

I.

According to the complaint, in the summer of 2008 defendant Frederick Walls, a captain at the Maryland Correctional Training Center ("MCTC") in Hagerstown, Maryland, and defendant James Peguese, the Assistant Commissioner of Security Operations, requested that the state Department of Public Safety and Correctional Services's ("DPSCS") Ionscan team perform a drug interdiction operation at MCTC. Captain Walls made this request at the direction of his supervisors, including defendant Kenneth Horning, MCTC's warden. The interdiction team, employed by DPSCS, uses a scanning device called an Ionscan to detect the presence of illicit substances on a person's body, clothing, and belongings. After a sample is collected, the device uses ionization to determine the sample's chemical identity. Through this method, the Ionscan can detect microscopic amounts of controlled substances.

The request was approved by MCTC and DPSCS supervisory personnel. On August 12, 2008, the Ionscan team, led by defendant Lieutenant Tonya Leonard, set up an Ionscan station in MCTC's visitor registration area. The complaint alleges that before any scanning took place, all of the defendants agreed that a positive result from the Ionscan machine would be followed by a vehicle search by a K-9 or correctional officer, which would itself be followed by a "strip and visual body cavity search" regardless of whether the vehicle search turned up any drugs. At the time, however, there was no official policy governing strip and cavity searches of prison employees.

The plaintiffs, employees and independent contractors of the DPSCS, were scanned on their way into MCTC that morning. While the great majority of persons tested negative, plaintiffs each tested positive in varying degrees for the presence of drugs. The plaintiffs allege that Lieutenant Leonard made a "judgment call" that anyone who set off an alarm would be subject to the searches, regardless of the Ionscan's reading on the amount of the substance detected.

According to the complaint, the searches that took place after the positive alert followed a roughly similar pattern. For instance, after one plaintiff's positive Ionscan alarm and fruitless vehicle search she was asked to remove her clothing piece by piece, squat, and cough. She, like the other plaintiffs, does not allege that she was subjected to a manual body cavity search or otherwise physically touched during the visual inspection. Her search, like those of the other plaintiffs, was conducted by same-sex officers in a public restroom. None of the plaintiffs allege, however, that anyone other than the searching officers was present. After the search all plaintiffs passed a urinalysis test.

There were a few differences in the search allegations. One of the plaintiffs, Sergeant Robert Mumma, did not claim that he was required to fully undress, and several of them — George Keefer, Officer Jose Rodriguez, and Officer Jeremy Sowers — did not indicate that they were forced to squat and cough, though Sowers did state that he was subjected to a "visual body cavity search." Those searched claim they were not given a sufficient chance to explain how they could have innocently come into contact with illicit substances. Although there appear to be no allegations that the searching officers committed misconduct during the actual searches themselves or that the searches themselves took more than a brief amount of time, the plaintiffs do allege that on the day in question, the Ionscan machine was neither operated nor operating correctly.

The plaintiffs filed suit against the previously mentioned defendants, as well as against Secretary Gary Maynard of the

DPSCS, Commissioner Michael Stouffer of the DPSCS's Division of Corrections, Lieutenant Rhonda Ralston (one of the officers who conducted the searches of the female plaintiffs), and Lieutenants Kenneth Frick and John Doe (who along with Captain Walls conducted the searches of the male plaintiffs). The district court granted the defendants' motion to dismiss, rejecting the plaintiffs' Fourth Amendment claim on grounds of qualified immunity and their other causes of action for failing to state a claim. It reasoned that although there were difficult questions regarding the usefulness of the Ionscan machine and about the adequacy of Maryland's search protocols, "[u]ltimately, because the law regarding the use of Ionscan machines was not clear at the time of the search, the Defendants are entitled to qualified immunity."

## II.

We review the district court's decision to grant a motion to dismiss de novo. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). During that review, we accept the complaint's factual contentions as true, *see id.*, though we need not accept the plaintiffs' legal conclusions, *see Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). Here, we limit our review to the complaint itself.[1]

---

[1]The plaintiffs attached a copy of an internal DPSCS report regarding the incident to their response to the defendants' motion to dismiss. We generally do not consider materials other than the complaint and documents incorporated into it when evaluating that complaint under Rule 12(b)(6), though courts may consider a document attached by the defendant to its motion to dismiss where the document "was integral to and explicitly relied on in the complaint" and where "the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quotation omitted). We do not consider the report here because it was not explicitly relied upon in the complaint and because the plaintiffs argued that the district court should not consider evidence outside of the pleadings, attaching the report for consideration only if the district court disagreed with them on this point.

To state a claim under 42 U.S.C. § 1983, plaintiffs must allege facts suggesting that their federal rights have been violated by state officials. However, even where an officer violated the plaintiff's rights, he may claim immunity if the law in question was not clearly established. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In keeping with courts' reluctance to answer constitutional questions unnecessarily, we may determine whether the constitutional rights allegedly violated here were clearly established without first determining whether those rights exist at all. *See Pearson v. Callahan*, 129 S. Ct. 808 (2009). In this case, we need not address whether the searches violated the Constitution. Inasmuch as the law regarding Ionscans and searches in the prison employee context was not clearly established, the defendants are entitled to qualified immunity. We begin by laying out that immunity's basic principles and then address the lack of clearly established law regarding these searches.

## A.

The basic principles surrounding qualified immunity are well settled. Qualified immunity "strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). It ensures that officials are not unfairly strung up for money damages as a result of "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). It encourages capable citizens to join the ranks of public servants by removing the threat of constant litigation. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985). And it safeguards officers' discretion and expertise against judicial overreaching. "[P]olice officers [and] prison wardens . . . routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them." *Davis v. Scherer*, 468 U.S. 183, 196 (1984). Second-guessing such judgment calls

would inhibit "principled and fearless decision-making," *Richardson v. McKnight*, 521 U.S. 399, 408 (1997) (quotation omitted), and displace experienced local administration with more removed judicial policymaking. The real-world results of such forays would not be salutary.

### B.

The officers here are alleged to have violated the Fourth Amendment's proscription "against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Applying the Fourth Amendment has always required consideration of a search's context and characteristics rather than a mechanical application of hard-and-fast rules. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (examining the location and scope of the search, the justification for it, and the manner in which it was executed). Plaintiffs' expectations of privacy are necessarily conditioned by the fact of their employment in a correctional institution. In recognition of these lowered expectations, we have previously concluded that where prison authorities "possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person," they may conduct a visual body cavity search of that employee. *Leverette v. Bell*, 247 F.3d 160, 168 (4th Cir. 2001).

### III.

Proper notice to public officials lies at the heart of qualified immunity. After all, it would be neither fair to individual public servants nor conducive to effective governance to ambush and blindside officials with sizeable damage awards. One may legitimately agree or disagree with the use of Ionscans in penal facilities, but that is not the question. For purposes of this case, it has never been clearly established that a strip or visual body cavity search after an Ionscan alarm cannot satisfy Fourth Amendment standards.

A.

For several reasons, nothing in the Supreme Court's decisions or in our own indicates that a positive Ionscan result cannot generate reasonable suspicion. First, the reasonable suspicion standard is not an exacting one. It requires only "a moderate chance of finding evidence of wrongdoing," *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2639 (2009), an amount "considerably less than proof of wrongdoing by a preponderance of the evidence," *United States v. Sokolow*, 490 U.S. 1, 7 (1989). And reasonable suspicion can come from sources categorically less reliable than those that may be relied upon to meet the higher probable cause standard. *See Alabama v. White*, 496 U.S. 325, 330 (1990).

Second, there was no reason for the searching officers to believe that the Ionscan could not reach this threshold. Both sides accept the fact that a properly deployed, properly functioning Ionscan device can detect drugs and other chemicals. In keeping with this recognized capability, ion scanning machines have been widely used, *see United States v. Hernández-De La Rosa*, 606 F. Supp. 2d 175, 179 (D.P.R. 2009) (noting expert testimony that "fifty thousand ion scan devices [are] in use throughout the world"), and in a variety of law enforcement settings, *see, e.g.*, *United States v. Alvarez-Manzo*, 570 F.3d 1070, 1073 (8th Cir. 2009) (noting the use of ion scanning to confirm the presence of drugs in a suspicious bag); *United States v. Rodriguez-Durán*, 507 F.3d 749, 755-56 & n.5 (1st Cir. 2007) (noting the use of ion scan evidence at trial to prove that a vessel contained cocaine).

Finally, though the case law on point is particularly sparse, several courts have found Ionscan evidence reliable enough. *See, e.g.*, *Hernández-De La Rosa*, 606 F. Supp. 2d at 187-88 (upholding the introduction of expert evidence based on mobile ion scanning in a criminal prosecution); *Mitchell v. Dep't of Corr.*, 675 So.2d 162, 165 (Fla. Dist. Ct. App. 1996) ("Because it cannot be said that the Ionscan test is unreason-

able, we conclude that a positive test result is 'good reason' to conduct further reasonable search procedures of the kind employed here and therefore may constitute a reasonable suspicion.").

While some courts have expressed concerns about the technology, *see, e.g.*, *United States v. Romero*, 32 F.3d 641, 647 (1st Cir. 1994), none has come close to barring its use or declaring its inability to create reasonable suspicion. In such circumstances, it was not clearly established that the Ionscan could not create reasonable suspicion. *See Ashcroft v. al-Kidd*, No. 10-98, slip op. at 9 (U.S. May 31, 2011) ("At the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional.").

B.

In response to this line of reasoning, plaintiffs contend that *Leverette* provided all the clearly established law needed to put the defendants on notice: *Leverette* suggested that searching officers must have "reasonable cause to believe that drugs . . . are concealed in the particular place" to be searched, *Leverette*, 247 F.3d at 168 (quoting *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982)), and the allegedly malfunctioning and misused Ionscan machine could not have provided that reasonable cause here.

This argument misfires in a number of ways. In qualified immunity analysis, the right allegedly violated must be defined "at a high level of particularity." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (quotation omitted). Otherwise, plaintiffs would be able to "transform[ ] . . . a guarantee of immunity into a rule of pleading" by alleging violations of well-established but highly abstract rights. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). We cannot just ask whether reasonable suspicion was clearly needed, but rather whether a device like the Ionscan clearly could not pro-

vide that suspicion. As discussed above, this latter proposition has not been embraced by the courts, much less in clearly established terms.

The plaintiffs' argument also ignores the differences between *Leverette* and this case. Previous cases need not be on all fours with the current one to clearly establish the law for qualified immunity purposes. *See Amaechi v. West*, 237 F.3d 356, 362-63 (4th Cir. 2001). But they must be close enough that "existing precedent . . . placed the statutory or constitutional question *beyond debate*." *al-Kidd*, No. 10-98, slip op. at 9 (U.S. May 31, 2011) (emphasis added); *see also Swanson v. Powers*, 937 F.2d 965, 969 (4th Cir. 1991) (noting that the case law must "leave no doubt that the challenged action was unconstitutional.").

*Leverette* does not satisfy this condition. It discussed prison searches based on tips by informants, perhaps the Fourth Amendment's most recurring characters. *See Leverette*, 247 F.3d at 163; *see also Florida v. J.L.*, 529 U.S. 266 (2000); *Alabama v. White*, 496 U.S. 325 (1990); *Illinois v. Gates*, 462 U.S. 213 (1983). *Leverette* focused on the factors important to the informant context: the specificity of the tip, the likely accuracy of the informant, and the decisionmaking process used in choosing whether or not to search. *See Leverette*, 247 F.3d at 168.

*Leverette* had nothing to say about Ionscans, or even about new technologies generally. It is often difficult for judges, let alone prison officials, to apply traditional Fourth Amendment concepts to cases involving novel technology. *See, e.g.*, *City of Ontario v. Quon*, 130 S. Ct. 2619, 2629-30 (2010) (noting the hazard of laying out broad rules regarding expectations of privacy in employer-provided electronic communication devices); *Mitchell*, 472 U.S. at 531-32 (tracing the Court's struggles in evaluating warrantless wiretapping). This case is no exception. For example, a prison official can readily apply common sense and personal experience when assessing an

informant's reliability. But questions regarding the Ionscan's reliability, as well as regarding the threshold reading required to justify a search, present not only less ploughed legal ground but more difficult technical considerations. In other words, *Leverette* cannot be easily transposed from the informant context into the Ionscan context and therefore could not have provided clearly established law barring the searches.

## C.

Allegations that the Ionscan machine was not operating correctly and not deployed pursuant to official policy do not alter the outcome. In conducting qualified immunity analysis, we look to "the information possessed by the searching officials" and to what a reasonable officer would have concluded from that information. *Anderson*, 483 U.S. at 641. The plaintiffs, however, do not allege facts indicating that those who planned or participated in the searches had reason to know about any machine malfunctioning. They do not allege facts indicating that any defendant knew or had reason to know that the Ionscan team misused the device. They do not allege facts suggesting that the searching officers or those who planned the interdiction operation had reason to know that the Ionscan team's training was so poor that its results could not be trusted. In short, they do not allege the kind of misuse of authority and disregard of law that should lead to monetary damages.

## IV.

Similarly, it was not clearly established that searches of the kind alleged here would violate the Constitution if based upon a positive Ionscan. In *Leverette*, the court noted that as a search's intrusiveness increases, the amount of particularized information supporting it must also increase. *Leverette*, 247 F.3d at 168. We held, though, that "prison authorities generally may conduct a visual body cavity search when they pos-

sess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person." *Id.*

The defendants could not reasonably have known that the information here would not meet these standards. It is crucial to remember the context in which these searches took place. As the Supreme Court has emphasized, operating a modern prison is an "inordinately difficult undertaking." *Turner v. Safley*, 482 U.S. 78, 85 (1987). The "intractable problems" of drug smuggling and drug use within prisons, *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003), only exacerbate those difficulties, recreating inside prison walls the same plagues of substance abuse and gang violence that landed many prisoners there in the first place. Federal judicial micromanagement of state prison administration risks unforeseen and counterproductive consequences, *see Turner*, 482 U.S. at 84-85, and courts therefore afford prison administrators latitude in dealing with this volatile environment and the risks it poses to the health and safety both of prison staff and of the inmates themselves, *see Overton*, 539 U.S. at 132.

In the qualified immunity context, these factors counsel against hastily concluding that the law clearly forbade the officers' conduct. Requiring prison administrators, on pain of individual damages, to refrain from embracing technological advances in prison administration would substitute judicial guesswork for expert administration and hamstring innovative efforts to resolve complex problems and to address changing conditions within our correctional system.

With this context in mind, it was not clearly established that the searches here could not meet *Leverette*'s standard. As the complaint asserts, an Ionscan can detect the presence of drugs on a person's clothing or possessions. It defies belief, then, to think that a positive Ionscan test gives no indication that someone is "hiding contraband on his or her person," as prison employees are unlikely to waltz into prison with contraband "hidden" only on their shirts. Indeed, given the nature

of prison security, it is likely that an employee smuggler would place the contraband in a fairly concealed location on his person. We need not and do not hold that positive Ionscan results will always justify a strip search; nonetheless, it was not clearly established that the Ionscan results obtained here could not.

We note finally that the alleged searches were conducted in a largely professional manner. Although any search like these will of necessity be intrusive, the officers took steps to limit that intrusion. There are no allegations that the plaintiffs were subjected to manual body cavity searches or physically touched during the searches. According to the complaint, same-sex officers conducted the searches, and though they conducted them in a public restroom, the plaintiffs do not allege that anyone else was present. Moreover, the plaintiffs do not claim that the searches themselves took an excessive amount of time or that they were harassed or demeaned during them. If, as some of the plaintiffs contend, they were later subjected to demeaning commentary because of the searches, that does not serve to render the searches themselves unconstitutional. We do not for a moment minimize the sensitivity of searches such as these, but that does not lead to the conclusion that the officers were carrying out indisputably important correctional functions in violation of clearly established federal law.[2]

## V.

Given the constitutional values at stake in this case, prison authorities would do well to construct regimes that balance solicitude for the human dignities protected by the Fourth Amendment with what are undeniably pressing institutional

---

[2]The district court's dismissal of plaintiffs' state law claims was not appealed. We have also reviewed the district court's rejection of the plaintiffs' supervisory liability claims and have found no reason to disagree with its decision to dismiss them.

needs. *See Leverette*, 247 F.3d at 166 ("[W]e must balance the government's need for the particular search against the invasion of personal rights entailed by the search.").

Intermediate steps such as interviews, consultation of employment histories and job duties, pat-downs, and other less invasive measures may render more problematic intrusions unnecessary after every Ionscan alert. We of course do not suggest that strip searches are invariably out of bounds, but such searches plainly are a demeaning form of treatment, *see Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996), and one that should not be visited casually by an institution upon its own employees. Clearer policies addressing the reliability of different Ionscan readings and training guidelines for Ionscan operators may spare institutions later headaches in court.

Such policies are for prison experts to develop, not the courts. Running a prison is challenging even in the best of circumstances, *see Thornburg v. Abbott*, 490 U.S. 401, 407 (1989), and the presence of contraband in prisons threatens to make a tense environment more combustible still. The officials here sought to thwart this threat by using advanced technology and employee searches, an area in which law was sparse and lines were anything but clearly set.

To impose monetary liability on these defendants in this uncertain landscape would essentially make them scapegoats for society's underlying ambivalence about the costs and benefits of new devices and instruments. The Fourth Amendment's broad standards are often difficult to apply in the prison and technology contexts, let alone both, and nothing from the Supreme Court or this court clearly prohibited the officials from addressing their pressing needs in this way. Whatever exception might be taken to their actions, there should be no exception to the proposition that officials placed in tough spots are entitled to fair notice that what they did violated federal law. *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998) (noting the "obvious unfairness" of imposing

liability on officials whose conduct did not violate clearly established federal law). The defendants here did not receive that notice, and the judgment of the district court is accordingly affirmed.

*AFFIRMED*