**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1960**

───────────────

BIKACHI AMISI,

> Plaintiff – Appellee,

v.

LAKEYTA BROOKS,

> Defendant – Appellant,

and

BRYAN BROWN; ROY TOWNSEND, JR.,

> Defendants.

───────────────

**No. 21-1962**

───────────────

BIKACHI AMISI,

> Plaintiff – Appellee,

v.

ROY TOWNSEND, JR.,

> Defendant – Appellant,

and

BRYAN BROWN; LAKEYTA BROOKS,

Defendants.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.  David J. Novak, District Judge.  (3:20−cv−00218−DJN)

_____

Argued:  September 22, 2023                      Decided:  February 22, 2024

_____

Before DIAZ, Chief Judge, and AGEE and HARRIS, Circuit Judges.

_____

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Agee and Judge Harris joined.

_____

**ARGUED:**  Carlene Booth Johnson, PERRY LAW FIRM, PC, Dillwyn, Virginia; Alexander Francuzenko, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellants.  Danny Zemel, THE KRUDYS LAW FIRM, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Thea A. Paolini, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Lakeyta Brooks.  Mark J. Krudys, THE KRUDYS LAW FIRM, Richmond, Virginia, for Appellee.

_____

2

DIAZ, Chief Judge:

When Bikachi Amisi arrived at Riverside Regional Jail for her first day as a contract jail nurse, Officer Lakeyta Brooks mistook her for an inmate and strip searched her. Amisi sued Brooks and two other jail employees under 42 U.S.C. § 1983 for violating her Fourth Amendment rights. She also brought several tort claims under Virginia state law.

The district court denied the defendants' motions for summary judgment. It held that Brooks and her supervisor, Officer Roy Townsend, were entitled to neither qualified immunity nor good-faith immunity under Virginia law. It also held that the Virginia Workers' Compensation Act's exclusivity provision didn't bar the defendants from suit.

Finding no error, we affirm.

I.

A.

Though the parties agree on some basic facts, most of the material facts are disputed. Everyone agrees that when Amisi arrived at the jail, she didn't know where to go for her nurse orientation. While in the parking lot, Amisi found Sergeant Bryan Brown and asked for help. She wore scrubs and carried a water bottle and her lunch.

Brown directed Amisi to enter the back door of the jail's Pre-Release Center, which houses "weekender" inmates serving non-consecutive sentences. When weekenders arrive at the Center, they have "orientation" and complete the jail's intake process, including strip and pat-down searches. The Center takes weekenders' personal property, disposing of or storing it as appropriate.

3

The back door of the Center serves as the inmate intake entrance. It has two locked doors with a sallyport in between. The outer door is operated by the Primary Control Officer, a role Brown then held. The inner door is operated by the Intake Officer, who's stationed in the intake area, just inside the inner door. Amisi rang the buzzer, entered through both doors, and met Intake Officer Roy Townsend. Townsend told Amisi to take a seat in the Intake Area.

Before taking custody of a weekender, Pre-Release Center staff must verify that the inmate is legally committed to the facility. The Center's then-Weekend Coordinator, Nichole Roney, prepared files for the weekenders expected to attend orientation on each day. But sometimes inmates showed up on the wrong day, or their paperwork was slow to arrive from the court. Roney tried to accommodate these individuals by letting them participate in orientation even when they weren't scheduled.

Townsend didn't have a file for Amisi. He called Roney, who also didn't have paperwork for her. Roney told Townsend she would come speak with Amisi.

While Amisi was waiting, Brooks entered the intake area, having just searched an incoming inmate. Brooks directed Amisi to follow her into the women's locker room, and Amisi did. While in the locker room, Brooks and Amisi discussed Amisi's food and water bottle, and Brooks told Amisi to throw away her food. Brooks also strip searched Amisi and conducted a pat-down search after she re-dressed. Amisi then returned to the intake area.

Eventually, Roney arrived, learned Amisi worked for the jail's health contractor, and called a nurse who told her Amisi should be in the main jail for nurse orientation. The

4

nurse retrieved Amisi from the Pre-Release Center, and Amisi completed her eight-week contract.

The rest of the facts are disputed, both between Amisi and the defendants, and between the defendants themselves.

First, the parties dispute what happened before Brooks took Amisi to the locker room. Townsend claims he asked Amisi multiple times to confirm that she was at the Center for weekender orientation. He says he asked her to sit while he verified that she should be there and then began reviewing his files and calling Roney. Townsend says he didn't see Brooks take Amisi to the locker room and only realized Amisi was missing the next time he looked up.

Amisi meanwhile insists that when she arrived in the intake area, she told Townsend she "was a nurse" and it was her "first day to work there." *Amisi v. Riverside Reg'l Jail Auth.*, 555 F. Supp. 3d 244, 255 (E.D. Va. 2021). She also says she told him it was her "orientation day," and that she had "an appointment." *Id.* Amisi agrees Townsend asked her to wait. But he didn't explain that he would try to verify she was in the right place, and she claims she never saw Townsend on the phone. Amisi says that Brooks spoke to Townsend, and Townsend pointed at her before Brooks took her to the locker room. Brooks then asked Amisi to follow her to the locker room without confirming Amisi was a weekender.

Complicating the picture, Brooks claims she asked both Amisi and Townsend if Amisi was there for weekender orientation and both responded affirmatively. Brooks says Townsend also gestured to Amisi and said, "The weekender for orientation is sitting on the

5

bench." *Id.* And Townsend was "right there" when Brooks took Amisi to the locker room and never asked Brooks to wait. *Id.*

The parties also dispute what happened after Brooks took Amisi into the locker room. Brooks claims that she confirmed with Amisi she was a weekender. Brooks then asked Amisi, "How many weekends she was doing?" and Amisi said eight. *Id.* Brooks admits Amisi asked whether nurses had to be strip searched, but claims she told Amisi in response that "we have all type of people that work here that do weekend time."[1] J.A. 757.

Brooks and Townsend dispute the content of a conversation they had during the search. Townsend says Brooks left the locker room to ask whether the Center held food for inmates and whether they could hold a water bottle "for somebody." *Amisi*, 555 F. Supp. 3d at 255. Townsend says he didn't know who Brooks was talking about and couldn't see or hear what was happening in the locker room. Brooks, however, claims that she asked Townsend if Amisi could keep her food, Townsend said no, and then Townsend took Amisi's water bottle to the intake desk.

Amisi describes her interaction with Brooks differently. She says she complied with Brooks's order to follow her and did so because she thought they were going to her nurse orientation. Amisi also recounts a more detailed conversation about her lunch. She claims she asked Brooks why she couldn't bring food as she would "be working for 12 hours" and

---

[1] Brooks's statement makes no sense—she likely meant that it was common for working people to serve time as weekenders, regardless of their professions.

then suggested, "Maybe I can keep it and at the end of the day when I leave, I can take it home with me." *Id.* at 256. She expressed surprise that the jail would be feeding her.

Amisi also asserts that she specifically asked about searching employees. She claims, for example, that when Brooks told her to remove her clothes she said, "Why should I take my clothes off?" *Id.* She questioned whether they had "to search people who work here." *Id.* And she told Brooks she was a nurse and would "be working" at the jail, before asking, "[E]very day I come here, I have to take my clothes off?" *Id.*

Amisi says that before the search, she asked Brooks whether she could call her staffing agency, saying she wouldn't have accepted the job had she known about the strip search policy. But Brooks wouldn't let her, reiterating that she needed to undress.

Other jail employees testified that Brooks was required under jail policy to ensure Amisi was there for weekender orientation before searching her.

## B.

Amisi sued Brooks, Townsend, and Brown, alleging that they violated her Fourth Amendment right to be free from unreasonable searches and seizures. She also brought a variety of Virginia state law tort claims.

The defendants moved for summary judgment, challenging Amisi's claims on the merits and asserting qualified immunity and Virginia good-faith immunity. They also asserted that the Virginia Workers' Compensation Act barred Amisi's state-law claims. The district court denied their motions on all grounds.

7

This appeal followed.[2]

## II.

Brooks and Townsend first argue that the district court erred in denying them qualified immunity on Amisi's § 1983 claim. We disagree.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (cleaned up). We may immediately review a district court's summary judgment denial of qualified immunity since qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Hulbert v. Pope*, 70 F.4th 726, 732 (4th Cir. 2023) (first citing *Williams v. Strickland*, 917 F.3d 763, 767 (4th Cir. 2019); and then citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Our review is limited though, so we can't consider Brooks's and Townsend's challenges to the district court's view of the facts. *See Mitchell*, 472 U.S. at 528. But we may still decide whether Brooks and Townsend are entitled to qualified immunity, "considering the facts as the district court viewed them as well as any additional undisputed facts." *Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014). We review the district court's denial of qualified immunity de novo. *Putman v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023).

---

[2] Brown isn't a party to this appeal.

8

To defeat qualified immunity, Amisi must show that (1) the officer violated one of her constitutional rights, and (2) the "right at issue [was] clearly established." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (cleaned up). If Amisi fails at either prong, Brooks and Townsend are entitled to summary judgment.

As did the district court, we address Brooks's and Townsend's qualified immunity defenses separately.

## A.

Brooks argues that a reasonable officer in her position wouldn't have understood that seizing and strip searching Amisi violated her Fourth Amendment rights.[3] Brooks contends she wasn't on notice that she was violating Amisi's rights because she believed Amisi was an inmate and inmate strip searches are constitutional if conducted reasonably. And regardless, Brooks says, Amisi's right to be free from strip searches wasn't clearly established.

### 1.

We begin with the alleged constitutional violation. For that, we must determine whether the strip search was unreasonable. When "analyzing the reasonableness of a physically intrusive search, we must balance the government's need for the particular search against the invasion of personal rights." *Leverette v. Bell*, 247 F.3d 160, 166 (4th Cir. 2001) (cleaned up).

---

[3] Unlike Townsend, Brooks doesn't distinguish the reasonableness of the search with the reasonableness of the seizure, so we'll consider them in tandem.

The calculus differs for prison employees, who have a diminished expectation of privacy by nature of their employment. *Id.* at 168. But employees don't abandon their Fourth Amendment rights when they enter the prison gate. We've held that a body cavity or strip search of a prison employee is reasonable only if officials have "reasonable and individualized suspicion" the employee is carrying contraband. *Id.*; *see also Braun v. Maynard*, 652 F.3d 557, 561 (4th Cir. 2011).

Brooks doesn't suggest that she suspected Amisi of having contraband. Instead, she argues the prison-employee cases "are inapposite" because they "ignor[e] the central issue of this case—that Amisi was not a known employee, but an employee mistaken for an inmate." Appellants' Br. at 34. Thus, says Brooks, we should look to the caselaw involving inmates rather than employees. *See id.* at 32. And she points out that the Supreme Court hasn't required individualized suspicion for strip searches involving inmates. *Id.*; *see Bell v. Wolfish*, 441 U.S. 520, 560 (1979).

But it doesn't matter whether Brooks subjectively believed that Amisi was an inmate if her belief was objectively unreasonable. *See Kentucky v. King*, 563 U.S. 452, 464 (2011) ("Our [Fourth Amendment] cases have repeatedly rejected a subjective approach, asking only whether the circumstances, viewed objectively, justify the action." (cleaned up)). Just as we decline to grant qualified immunity when officers make unreasonable mistakes of law, so too with unreasonable mistakes of fact. *See Henry*, 652 F.3d at 531–33.

In *Henry*, for example, an officer shot a fleeing suspected misdemeanant who he had no grounds to believe was armed or dangerous. 652 F.3d at 532. On its face, that

10

seizure was unreasonable. *See id.* at 531–32 ("A police officer who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others' violates that suspect's Fourth Amendment rights." (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). But the parties stipulated that the officer believed he was firing his taser, not his gun.

We held that the officer's belief he was holding his taser wasn't objectively reasonable, since the gun was heavier, was holstered on a different part of the officer's body, and had a thumb safety. *Id.* at 532–33. Because the officer's mistake of fact was unreasonable, and because it was clearly established that an officer couldn't shoot a fleeing, nonthreatening misdemeanant, we reversed the district court's grant of qualified immunity. *Id.* at 536.

Likewise, the record here supports a finding that Brooks's mistake was unreasonable, drawing all inferences in Amisi's favor (as we do at the summary judgment stage). *See id*.

Amisi told Brooks she was a nurse and asked if employees of the jail needed to be strip searched. She asked if she could call her staffing agency before proceeding with the search, and expressed surprise to Brooks both that she needed to throw away her lunch and that the jail would be feeding her. While Brooks disputes these facts, that's for a jury to decide, not us. We decide only whether those facts are *material*, which they are.

As the district court said, the accuracy of Amisi's account "proves nearly dispositive as to the issue of the reasonableness of Brooks'[s] belief." *Amisi*, 555 F. Supp. 3d at 271.

11

Taking Amisi's account as true, Brooks acted unreasonably when she mistook Amisi for an inmate, not an employee.

2.

Still, even if Brooks violated Amisi's Fourth Amendment rights, Brooks is nonetheless entitled to summary judgment if those rights weren't clearly established. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

We look to the "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose to determine whether a reasonable officer would know that his conduct was unlawful in the situation he confronted." *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016) (internal citations omitted). These cases "must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). But a right doesn't necessarily need to have been "recognized by a court in a specific context" to be clearly established. *Meyers v. Baltimore County.*, 713 F.3d 723, 734 (4th Cir. 2013).

Here, it was clearly established when Brooks strip searched Amisi (a prison employee) that she couldn't do so without individualized suspicion that Amisi possessed contraband. *See Leverette*, 247 F.3d at 168; *Braun*, 652 F.3d at 557. Brooks claims that our cases are distinguishable because Amisi wasn't a "known prison employee[]"; thus she wasn't on notice that searching Amisi would violate her rights. Appellants' Reply Br. at 20. But that's immaterial because Brooks's mistake was unreasonable.

12

Returning to *Henry*, the officer claimed that, even if he unreasonably believed he fired his taser, it wasn't clearly established that an officer violates the Constitution when he mistakenly shoots his gun at a nonviolent misdemeanant. 652 F.3d at 534. We rejected that argument because the officer's subjective beliefs and intentions "have no place in our constitutional analysis." *Id.* A "*reasonable* officer" would have known that the shot violated the suspect's rights. *Id.*

So too here. We must determine only whether a reasonable officer would have known that Amisi was an employee, not an inmate. As we've explained, a reasonable officer would. And a reasonable officer would have been on notice that strip searching Amisi, an employee, without individualized suspicion violated her Fourth Amendment rights.

Taking the facts in the light most favorable to Amisi, the record supports a finding that Brooks violated her clearly established rights. Accordingly, the district court properly denied Brooks qualified immunity.

B.

Unlike Brooks, Townsend doesn't concede that he seized or searched Amisi. But even if he did, he argues that the theory of liability asserted against him for each claim wasn't clearly established. We disagree, so we likewise affirm the district court.

We'll begin with the seizure claim against Townsend. A seizure occurs when, under the totality of the circumstances, the officer's "conduct would have communicated to a reasonable person that he was not at liberty to ignore the [officer's] presence and go about his business." *United States v. Bowman*, 884 F.3d 200, 211 (4th Cir. 2018) (cleaned up).

13

In conducting this analysis, we consider "the time, place, and purpose" of the encounter. *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 461 (4th Cir. 2013) (cleaned up). We also look to the number of officers, whether they were in uniform or displayed weapons, whether they touched the person or tried to block or restrain their movement, and whether they acted as if they suspected the person of illegal activity. *Id.*

Amisi willingly entered the jail. And Townsend is correct that a "consensual encounter" isn't a seizure within the meaning of the Fourth Amendment. *Id.* at 460 (cleaned up). But even so, the record could still support a finding that Townsend seized her later.

Townsend directed Amisi to sit down in the secured intake area, which she couldn't leave without the help of another officer. And when Brooks approached, Townsend pointed at Amisi, and Brooks immediately took her into the locker room. True, Amisi never tried to leave the intake area, and Townsend never physically restrained her. But the record supports a finding that Townsend's actions would have led a reasonable person to believe that she wasn't free to leave.

Moreover, it's undisputed that Brooks refused to let Amisi leave to call her agency when she asked. And Brooks gave Townsend Amisi's lunch and water bottle from the locker room. As the district court explained, Townsend waited outside during the search. He presumably understood that Brooks was strip searching Amisi in the locker room, as she did with other female inmates, so he knew Amisi wasn't free to leave.

Like Brooks, Townsend argues that his mistake about Amisi's status entitles him to qualified immunity, as in *Turner v. Kight*, 121 F. App'x 9 (4th Cir. 2015) (per curiam). In

14

*Turner*, we held that the district court correctly granted qualified immunity to a corrections officer who mistakenly subjected the plaintiff, a temporary detainee, to a strip search. *Id.* at 16.  We held that the officer's "mere negligence or carelessness" didn't constitute a constitutional violation, even though the officer failed to confirm the plaintiff's status before searching her. *Id.*  In other words, the officer's mistake was reasonable. *Id.*

*Turner* thus concerns *reasonable* mistakes, while the record here suggests the opposite.  Amisi says that she told Townsend she was an employee reporting for work.  And Townsend didn't see Amisi's name on his list of weekender inmates, nor could Roney confirm that Amisi was a weekender.  These facts (if proven) suggest that Townsend's mistaken belief was unreasonable.

Taking the facts in the light most favorable to Amisi, Townsend may also be liable for causing Amisi to be unreasonably searched.  Section 1983 creates liability not just for a state actor who *directly* deprives a plaintiff of her rights, but one who "causes" such a deprivation.  42 U.S.C. § 1983.  We've recognized this "effective causation" liability theory in several cases.  *See Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998); *Raub v. Campbell*, 785 F.3d 876, 881 n.6 (4th Cir. 2015); *Meeker v. Edmundson*, 415 F.3d 317, 322–23 (4th Cir. 2005); *see also Malley v. Briggs*, 475 U.S. 335, 337 (1986) (recognizing that an officer who submits a search warrant affidavit without reasonable grounds for probable cause can be liable under § 1983, even if he doesn't personally make the unlawful arrest).

Under this theory, an officer is liable if he "is the effective cause of another's direct infliction of the constitutional injury." *Sales*, 158 F.3d at 776.  The "requisite causal

15

connection can be established . . . by setting in motion a series of acts by others which the actors know or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560–61 (1st Cir. 1989)).

We've previously said that this doctrine doesn't apply in one context: excessive force. *See Gandy v. Robey*, 520 F. App'x 134, 142 (4th Cir. 2013) (finding the effective causation theory "highly dubious" in the excessive force context). Townsend argues that *Gandy* also limits the effective causation theory in the broader Fourth Amendment context, but we can't agree.

In *Gandy*, we recognized that for excessive force claims, we look to the "moment" the force is employed, where an officer's actions to "set in motion" the use of force beforehand wouldn't be relevant. *See* 520 F. App'x at 142. But that holding is unique to excessive force. For a suspicion-less search, unlike excessive force, the officers' actions before the offending conduct are no doubt relevant. And were we to extend *Gandy* to the entire Fourth Amendment context, we would read the causation language out of § 1983.

Turning back to the record, Townsend set Brooks's unreasonable search in motion. As the district court found, Townsend pointed at Amisi and signaled to Brooks to take her into the locker room. And he knew that Brooks performed strip searches of incoming inmates in that locker room. Given these facts, a jury could find that Townsend either knew or "reasonably should" have known that his actions would cause Brooks to unreasonably search Amisi. *See Sales*, 158 F.3d at 776.

16

What's more, Amisi's right to be free from unreasonable strip searches was clearly established when Townsend set the search in motion. To repeat, we've recognized that an officer may subject a prison employee to a body cavity search if he has reasonable suspicion the employee possesses contraband, and it's undisputed that Townsend had no such suspicion. *See Leverette*, 247 F.3d at 168; *Braun*, 652 F.3d at 557. And again, unlike in *Turner*, a jury could find that Townsend's belief that Amisi was an inmate was unreasonable.

In sum, because a reasonable officer would have been on notice that the strip search he caused would violate Amisi's constitutional rights, Townsend isn't entitled to qualified immunity.

III.

A.

Brooks and Townsend next argue that the exclusivity provision of the Virginia Workers' Compensation Act bars Amisi's state-law claims. We disagree.

The Virginia Workers' Compensation Act provides a remedy for injuries resulting "from an accident arising out of and in the course of the injured employee's employment." *Simms v. Ruby Tuesday, Inc.*, 704 S.E.2d 359, 362 (Va. 2011) (citing Va. Code Ann. § 65.2-101). When the Act applies, it "provides the sole and exclusive remedy available against the employer," *Butler v. S. States Co-op., Inc.*, 620 S.E.2d 768, 772 (Va. 2005), as well as the injured employee's coworkers, *see Pfeifer v. Krauss Constr. Co.*, 546 S.E.2d 717, 719 (2001). *See also* Va. Code Ann. § 65.2-307(A).

17

B.

Before turning to the merits, we must decide whether we may consider defendants' argument in this interlocutory appeal.  Amisi urges us not to, arguing that we lack jurisdiction to consider it now.

Ordinarily, our jurisdiction is limited to final decisions of the district court, so we would generally lack jurisdiction to review a denial of summary judgment.  *Williams v. Strickland*, 917 F.3d 763, 767 (4th Cir. 2019).  But the "collateral order doctrine" extends our jurisdiction to "a small class of collateral rulings" that are considered final even though they don't end the litigation.  *Davis v. City of Greensboro*, 770 F.3d 278, 281 (4th Cir. 2014) (cleaned up).  This doctrine covers "only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action."  *Id.* (cleaned up).

Decisions denying immunity are often immediately appealable collateral orders. *Nero v. Mosby*, 890 F.3d 106, 121 (4th Cir. 2018) (exercising jurisdiction over denial of absolute prosecutorial immunity and Maryland statutory immunity); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (federal qualified immunity); *Nixon v. Fitzgerald*, 457 U.S. 731, 742–43 (1982) (federal absolute immunity).  Yet "only a claimed *immunity from suit*, not a mere defense to liability," falls under the exception.  *Nero*, 890 F.3d at 121 (cleaned up).

The exclusivity provision in the Virginia Workers' Compensation Act provides total immunity from suit.  The Act gives workers "the right to assert no-fault liability against their employers" in exchange for giving up "the right to sue their employers in tort . . . a right that they had possessed under the common law."  *Lopez v. Intercept Youth Servs.,*

*Inc.*, 861 S.E.2d 392, 394 (Va. 2021); *see also Gibbs v. Newport News Shipbuilding & Drydock Co.*, 733 S.E.2d 648, 652 (Va. 2012) (The Act provides "no-fault compensation for workers in exchange for *immunity* for employers from actions at common law." (emphasis added)); *Whalen v. Dean Steel Erection Co.*, 327 S.E.2d 102, 106 (Va. 1985) ("[T]he law relieves the employer of *exposure to actions at law* from employees sustaining such injuries." (emphasis added)).  Since Virginia law treats the exclusivity provision as conferring immunity from suit, the denial of summary judgment on this claim is a collateral order that we may review.

Amisi's counterarguments are unavailing.  She points to decisions from the Supreme Court of Virginia describing the Act's exclusivity provision as an "interlocutory" issue that isn't immediately appealable.  *See* Appellee's Br. at 31–32 (collecting cases). From this, Amisi infers that Virginia law views the exclusivity provision as conferring immunity from liability, not suit.  *Cf. Black v. Dixie Consumer Prod.*, 835 F.3d 579, 583 (6th Cir. 2016) (holding that Kentucky treated workers compensation exclusivity provision as an immunity from suit "by permitting interlocutory appeals from the denial of [that] immunity").

But that argument ignores Virginia's unique appellate landscape.  Unlike in the federal system, Virginia doesn't allow interlocutory appeals as of right of *any* immunity from suit—including legislative or even sovereign immunity.  *See Payne v. City of Charlottesville*, 102 Va. Cir. 399C, 2019 WL 11838789, at *8 n.8 (Va. Cir. Ct. 2019) (encouraging defendants to file an interlocutory appeal of denial of legislative immunity under permissive appeal statute), *rev'd*, 856 S.E.2d 203 (Va. 2021); *Commonwealth v.*

*Muwahhid*, 887 S.E.2d 801, 803 n.1 (Va. Ct. App. 2023) (describing how the Virginia Legislature passed a law making sovereign immunity immediately appealable in 2022, but then repealed the law six months later). Instead, the Court of Appeals may only hear an interlocutory appeal of a general civil matter if it fulfills certain statutory requirements. Va. Code Ann. § 8.01-675.5 (West). And even then, the Court of Appeals retains discretion over whether it will entertain the interlocutory appeal. *Id.*

If Virginia permitted interlocutory appeals of other immunities from suit, its decision to bar interlocutory appeals of denials of the exclusivity provision might speak to whether the provision conferred immunity from suit. But it doesn't, and we're bound to apply federal procedural rules to determine our jurisdiction. *Nero*, 890 F.3d at 122.

Amisi next says that the exclusivity provision doesn't provide immunity because Brooks and Townsend "face[] suit in a different forum, namely, the Virginia Workers' Compensation Commission." Appellee's Br. at 32. Yet the availability of an administrative remedy doesn't change that employers are spared from defending themselves in court. Allowing Amisi's suit to proceed would permanently deprive the defendants of that benefit.

Further, Virginia courts have treated the exclusivity provision as jurisdictional. *See Lucas v. Biller*, 130 S.E.2d 582, 587 (Va. 1963) (dismissing suit against employer under predecessor exclusivity provision because "the [Workers' Compensation] Act has deprived all trial courts of jurisdiction over such matters"); *Evans v. Hook*, 387 S.E.2d 777, 780 (Va. 1990) (affirming dismissal of suit for lack of subject matter jurisdiction). Were the

20

exclusivity provision a defense to liability, courts would treat it as an affirmative defense, not a jurisdictional bar to suit.

We acknowledge that the Supreme Court of Virginia has, in dicta, suggested that the Act merely allows immunity from liability. *See Roller v. Basic Const. Co.*, 384 S.E.2d 323, 325 (Va. 1989) ("In exchange, employers under the canopy of the Act are sheltered from common-law liability in tort." (cleaned up)). But the greater (and more recent) weight of authority holds that the immunity extends to avoidance of suit. *See generally David White Crane Serv. v. Howell*, 714 S.E.2d 572, 575 (Va. 2011) (recognizing that the provision confers "immunity from a common-law action in tort"); *Hudson v. Jarrett*, 606 S.E.2d 827, 829 (Va. 2005) ("An employee subject to the provisions of the Workers' Compensation Act cannot file an independent tort action against his employer or any fellow employee for injuries received in the course of employment." (cleaned up)).

Satisfied that we have jurisdiction over the district court's state law decision, we turn to the merits.

C.

For an injury to come within the scope of the Virginia Workers' Compensation Act, it must (1) result from an accident (2) arising out of and (3) in the course of the injured employee's employment. *Combs v. Va. Elec. & Power Co.*, 525 S.E.2d 278, 508 (Va. 2000).

Amisi concedes that her injuries resulted from an accident, but she disputes the second and third elements. We agree that, at bottom, Amisi's injuries didn't "arise out of" her employment, so we affirm the district court.

21

"The phrase arising out of refers to the origin or cause of the [plaintiff's] injury." *County of Chesterfield v. Johnson*, 376 S.E.2d 73, 74 (Va. 1989) (cleaned up). Virginia determines whether an injury arises out of employment using the "actual risk" test. *Simms*, 704 S.E.2d at 363. "Actual risk" differs from "the positional risk test used in other jurisdictions where simply being injured at work is sufficient to establish compensability." *County of Chesterfield*, 376 S.E.2d at 76.

Instead, an injury results from an "actual risk" only if it "can be seen to have followed as a natural incident of the work." *Simms*, 704 S.E.2d at 363 (cleaned up). By contrast, the test "excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause," nor one that comes from a hazard to which the worker would have been exposed regardless of the employment. *Id.* The danger needn't be foreseeable, but it must "be peculiar to the work and not common to the neighborhood." *Id.* (cleaned up).

While a close question, we agree with the district court that Amisi's injuries didn't "arise out of" her employment. First, the risk of an erroneous strip search was "common to the neighborhood." *Id.* Though Amisi may not have gone to the jail but for her employment, she faced the same risk of an erroneous search as any visitor arriving to the jail for the first time. *See Hill City Trucking, Inc. v. Christian*, 385 S.E.2d 377, 380 (Va. 1989) (declining to find that injuries arose out of employment where truck driver was assaulted at 3:00 a.m. by robbers while driving on a dark unfamiliar road, and where (1) there was no evidence that driver was targeted because of his employment, and (2) "anyone traveling down the road at 3:00 a.m. was subject to the same risk"). *cf. Combs*, 525 S.E.2d

22

at 510 (finding that employee was exposed to risk of negligent medical treatment "solely because" she was an *employee* of the defendant company).

Amisi wouldn't regularly be exposed to being searched while on the job, since by her second day, she knew not to go to the Pre-Release Center. The one-time nature of the risk distinguishes it from cases in which Virginia courts have found the Act applies even where the public is also exposed.

The Supreme Court of Virginia, for example, held the Act applied when an employee of a coin shop who "was required regularly to handle and carry large sums of money in cash to a bank" was a victim of a bank robbery. *R & T Invs., Ltd. v. Johns*, 321 S.E.2d 287, 289 (Va. 1984). The court found that "the [employee's] regular presence in a branch bank, exposed her to a special risk of assault[.]" *Id.* at 290. And it rejected the argument that the bank's "customers were equally exposed to the robbers," emphasizing the repeated nature of the employee's trips. *Id.*

Likewise, in *Roberson v. Whetsell*, the Court of Appeals of Virginia held that the plaintiff's "risk of being shot was peculiar to his employment" when he had to regularly drive "pas[t] a public housing complex where gunfire was commonplace." 463 S.E.2d 681, 683 (Va. Ct. App. 1995). While recognizing that the public also passes the complex, the court noted that the plaintiff was required "to make repeated, regular trips through the area." *Id.* at 683–84 (quoting *R&T Invs.*, 321 S.E.2d at 290).

Amisi's case is also distinguishable from those where performing the employee's duties exposes the employee to a heightened risk. To illustrate, the Court of Appeals of Virginia determined the Act applied to a greenhouse employee who was hit by a car while

23

turning off a set of sprinklers located alongside a road—a duty of his employment. *See Green Hand Nursery, Inc. v. Loveless*, 684 S.E.2d 818, 822–23 (Va. Ct. App. 2009).

The employer there argued that the employee's injury was not peculiar to the work being performed because the public too was exposed to the same risk. But the court held that the employee's duty (turning off the sprinklers) increased the risk to her "by diverting attention from the danger of [an] approaching vehicle." *See id.* at 823; *see also Marion Corr. Treatment Ctr. v. Henderson*, 458 S.E.2d 301, 303 (Va. Ct. App. 1995) (holding that correctional officer who slipped on stairs while observing guard tower was covered by Act because the requirement that he observe the tower "increased his risk of falling on this occasion and directly contributed to cause his fall and injury"). By contrast, nothing about Amisi's duties as a nurse increased her risk of being strip searched beyond that of any other first-time jail visitor.

In sum, the requisite causal relationship doesn't exist between Amisi's job and her risk of being strip searched, so the injury didn't "arise out of" Amisi's employment. Since this element isn't satisfied, we agree with the district court that the Virginia Workers' Compensation Act's exclusivity provision doesn't bar Amisi's state-law claims.

IV.

Townsend lastly argues that the district court erred in denying him immunity under Virginia law for Amisi's negligence, false imprisonment, and emotional distress claims. We disagree.

24

Under Virginia law, an officer is entitled to immunity if he acts "in good faith and with [a] reasonable belief in the validity" of his conduct. *See DeChene v. Smallwood*, 311 S.E.2d 749, 751 (Va. 1984); *see also Wingate v. Fulford*, 987 F.3d 299, 312 (4th Cir. 2021) ("Virginia law provides a defense to officers who subjectively believed in good faith that their conduct was lawful and whose subjective beliefs were objectively reasonable." (cleaned up)). We've recognized that Virginia's immunity doctrine "is congruent with the federal qualified immunity defense." *Wingate*, 987 F.3d at 312. The burden is on the defendant to show the defense applies. *Jordan v. Shands*, 500 S.E.2d 215, 219 (Va. 1998) (cleaned up).

Even if Townsend subjectively believed in good faith that his conduct was lawful, his belief must be objectively reasonable. *Wingate*, 987 F.3d at 312. As we've explained, Townsend acted unreasonably when he allowed Brooks to take Amisi into the locker room to be strip searched while still awaiting confirmation that Amisi was an inmate. He also acted unreasonably by participating in the strip search after Amisi was in the locker room.

Townsend's arguments to the contrary rest on his belief Amisi was an inmate and that he "was trying to help" her. *See* Appellants' Br. at 41–45. But at the summary judgment stage, we must take the district court's factual findings as true and resolve all disputed facts in Amisi's favor. Taking Amisi's account as true, Townsend's immunity defense under Virginia law fails for the same reasons as did his qualified immunity defense.

\* \* \*

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

25